UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT



| | | |
|---|---|---|
| ELENA POMA F/K/A ELENA AQUINO | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02CV543 (CFD) |
| | : | |
| CITY OF HARTFORD/ | : | |
| HEALTH DEPARTMENT | : | |
| | : | FEBRUARY 13, 2003 |
| Defendants | : | |

DEPOSITION OF ELENA POMA

Taken before Sandy K. Visentin, Licensed
Professional Reporter and Notary Public in and for
the State of Connecticut, pursuant to the Federal
Rules of Civil Procedure, at the law offices of
Kainen, Escalera & McHale, 21 Oak Street, Hartford,
Connecticut, on Thursday, February 13, 2003,
commencing at 9:54 a.m.

Sandy K. Visentin, LSR, RPR
CT Lic. #SHR.234
Andrews Reporting Service
330 Cook Hill Road
Cheshire, CT  06410
(203) 271-2190

APPEARANCES

REPRESENTING THE PLAINTIFF:

    MINITER & ASSOCIATES
    147 Charter Oak Avenue
    Hartford, CT   06106
    (860) 560-2590
        By:  Christine E. Corriveau, Esq.


REPRESENTING THE DEFENDANTS:

    KAINEN, ESCALERA & MCHALE, P.C.
    21 Oak Street
    Hartford, CT   06106
    (860) 493-0870
        By:  Joseph W. McQuade, Esq.


ALSO IN ATTENDANCE:

    Katherine M. McCormack   (partial attendance)
    City of Hartford Health Department

STATE OF CONNECTICUT   :
                       :  ss
COUNTY OF NEW HAVEN    :

    I, SANDY K. VISENTIN, a Registered Professional
Reporter and Notary Public duly commissioned and
qualified in and for the State of Connecticut, do
hereby certify that pursuant to notice there came
before me on February 13, 2003, the following-named
person to wit:  ELENA POMA, who was by me duly sworn
to testify to the truth and nothing but the truth;
that she was thereupon carefully examined upon her
oath and her examination reduced to writing under my
supervision; that this deposition is a true record of
the testimony given by the witness.

    I further certify that I am neither attorney nor
counsel for nor related to nor employed by any of the
parties to the action in which this deposition is
taken; and further, I am not a relative or employee
of any attorney or counsel employed by the parties
hereto, or financially interested in this action.

    IN WITNESS THEREOF, I have hereunto set my hand
and affixed my seal this 16th day of February, 2003.

                            *Sandy K. Visentin*

                            SANDY K. VISENTIN
                            LSR, RPR and Notary Public
                            CT Lic. #SHR.234
My Commission Expires:
August 31, 2006

1    full-time employment in?

2          A.    Department of Social Services.

3          Q.    And what was your position?

4          A.    Clerk-typist -- senior clerk-typist.

5          Q.    And who did you report to?

6          A.    Ramon Arroyo.

7          Q.    And was he the director at the time?

8          A.    Supervisor for that unit.

9          Q.    Which unit was it?

10         A.    AFDC.

11         Q.    And was that unit taken over by the state,

12   do you know?

13         A.    Yes.

14         Q.    And when was that?

15         A.    Somewhere the end of 1996.  '96, '97,

16   somewhere around there.

17         Q.    Were you still employed in the Department

18   of Social Services when AFDC was taken over by the

19   state?

20         A.    I was offered a transfer over to the Health

21   Department.

22         Q.    When you first started with the Department

23   of Social Services, I assume you had to join a union.

24   Is that correct?

25         A.    You don't have a choice.

1      Q.    Right.   Which union, when you first joined

2   the Department of Social Services, were you in?

3      A.    1716.

4      Q.    1716?

5      A.    Yes.

6      Q.    I know there are a bunch of acronyms, is

7   that AMIA, APIA, do you know?

8      A.    I think they go by AFME, I'm not sure.   But

9   I know it by number, it's 1716.

10      Q.    And when you went to the Health Department,

11   were you still in 1716?

12      A.    Yes.

13      Q.    And did you remain in 1716 throughout your

14   employment in the Health Department?

15      A.    Yes.

16      Q.    Are you still a member of 1716?

17      A.    Yes.

18      Q.    Have you ever held an office -- were you

19   ever an officer of 1716?

20      A.    No.

21      Q.    Have you ever been any union rep or

22   steward?

23      A.    No.

24      Q.    And I assume that your union helped you

25   with putting in for a transfer order; is that fair to

ANDREWS REPORTING SERVICE
(203) 271-2190

1   say?

2        A.   Not to my understanding.

3        Q.   How did that transfer -- how did your

4   request for a transfer arise?

5        A.   The process is you send a letter to the

6   Department of Personnel.

7        Q.   How did you find out that you needed to

8   send a letter to the Personnel Department?

9        A.   I called.

10        Q.   When you were in the Department of Social

11   Services, did you apply for any promotions or other

12   jobs?

13        A.   No.

14        Q.   When you first came to the Department of

15   Health, what was your position?

16        A.   Senior clerk-typist.

17        Q.   And who were you assigned to?

18        A.   Owen Humphries.

19        Q.   And throughout your time in the

20   Department of Health, were you always assigned to

21   Owen Humphries?

22        A.   Not for the entire time I was employed at

23   the Health Department.

24        Q.   How long were you assigned to

25   Owen Humphries?

1      A.   You need to clarify this for me.

2      Q.   Sure.

3      A.   Regarding the assignment part of it, I

4  was in the lead program for which he is the

5  coordinator.  However, the person that was signing my

6  time card after Mr. Humphries, there was a change in

7  his title.

8      Q.   He got promoted?

9      A.   Some changes, I'm not really sure what it

10  was.

11      Q.   Okay.

12      A.   So I'm not sure if you're asking me who was

13  signing my time card, because I was still working

14  with Mr. Humphries except he was not signing my time

15  sheet.

16      Q.   Okay.  Were you assigned to the lead

17  program throughout your employment at the Health

18  Department?

19      A.   Throughout the whole time, yes.

20      Q.   And at first is it fair to say

21  Owen Humphries was signing your time card?

22      A.   Yes.

23      Q.   And then did it become Kevin Hood?

24      A.   Yes.

25      Q.   Was anybody else responsible for signing

1    your time card?

2         A.    Not that I know.  No.

3         Q.    And I understand you were laid off in 1999;

4    is that correct?

5         A.    Yes.

6         Q.    Do you remember when in 1999 you were laid

7    off?

8         A.    It was about February, March.

9         Q.    And then you became re-employed by the City

10   of Hartford at some point, right?

11        A.    Yes.

12        Q.    And when was that?

13        A.    November of '99.

14        Q.    And had you applied for another position?

15   How did you become re-employed?

16        A.    When you're laid off, they keep your name

17   on a recall list.

18        Q.    So in November of '99 you were recalled?

19        A.    Yes.

20        Q.    From that February or March of 1999 time

21   period through November of 1999, did you have any

22   other employment?

23        A.    No.

24        Q.    Had you applied for other jobs?

25        A.    Yes.

1    there was no reason for the denial of that position,

2    other than my beliefs of discrimination.

3         Q.   And when you say discriminated against, on

4    what basis were you discriminated against?

5         A.   On the basis that I am female, that I am

6    Hispanic.  And I also believe my pregnancies played a

7    role in the discrimination process.

8         Q.   Now, obviously the City of Hartford and its

9    Health Department are an organization.  Is there

10   anybody in particular that you feel discriminated

11   against you?

12        A.   Ms. McCormack.

13        Q.   Anybody else?

14        A.   I feel Mr. Kevin Hood.

15        Q.   And in your own words how did Ms. McCormack

16   discriminate against you?

17        A.   Well, she is a director of the Health

18   Department so she has the final decisions over what

19   happens in the department.

20        Q.   What did she do to you to discriminate

21   against you?

22        A.   According to Mr. Hood, the first time he

23   called me into his office he claimed that

24   Ms. McCormack had made a comment to him that I was

25   not spending enough time at my work station or at my

1    desk.

2         Q.   Is that discriminatory?

3         A.   At first I didn't think that it was.

4         Q.   Because that's kind of her job, right?

5    She's the director and needs to make sure everybody

6    is working, right?

7         A.   Yes.

8         Q.   Now, you said at first you didn't think

9    that was discriminatory.  What made you change your

10   mind?

11        A.   There was an incident when I was talking to

12   a coworker of mine and we were conversating in

13   Spanish, and Mr. Kevin Hood came up to me -- I'm

14   sorry, let me rephrase that.

15        Q.   Okay.

16        A.   We were conversating in Spanish, and

17   Ms. McCormack happened to go by when we were having

18   the conversation.  Like a day after this happened, I

19   was once again talking to the same coworker when

20   Mr. Kevin Hood came over and told me right there in

21   the hallway that, if I can remember what he said,

22   This is what Katherine was talking about, and quotes,

23   because those were his comments.

24        Q.   And how -- I guess what I'm hearing is that

25   you were talking to your coworker and Ms. McCormack

1    noticed you were talking to your coworker, and then

2    you were talking to the same coworker a couple of

3    days later and Kevin Hood comes up to you and says,

4    Hey, this is what Katherine was talking about.

5    What's discriminatory about that?

6         A.   The fact that the times that the incident

7    happened I was speaking Spanish.  I was speaking to a

8    person obviously who is of Spanish descent, or if you

9    want to call it Latino.  Hispanic.  And the fact that

10   his comment was, This is what Katherine was talking

11   about, made me think that her complaining was not the

12   fact that I was talking to a coworker.  Obviously

13   we're conversating in Spanish.  As far as I know

14   neither Mr. Hood nor Ms. McCormack speak Spanish so

15   they wouldn't know what we were conversating about.

16        Q.   What were you talking about?

17        A.   We were talking about work.

18        Q.   What were you saying?

19        A.   We were talking about some pictures that

20   Ms. Bello had taken out in the field.

21        Q.   And this is Matilde Bello?

22        A.   Yes.

23        Q.   And what is her position?

24        A.   Public health and sanitary.

25        Q.   And it's fair to say that I guess in the

1    that I like to inquire about, you know, what my

2    coworkers, you know, you never know, it might be a

3    job that interests you and you might want to pursue

4    something in that area.

5         Q.    I think you said she was talking about

6    pictures, right?

7         A.    Yes.

8         Q.    And do you remember what the pictures

9    depicted?

10         A.    I believe it was about high grass and

11    garbage and things of that nature.

12         Q.    Now, as I understand it, Ms. McCormack

13    saw you speaking with Ms. Bello in Spanish but she

14    didn't stop and ask you what the conversation was

15    about?

16         A.    No, she did not.

17         Q.    And she, in fact, never spoke to you about

18    those conversations; is that fair to say?

19         A.    No, she did not.

20         Q.    I'm sorry, I think I asked a question --

21    perhaps I didn't artfully phrase that question.

22              Did Ms. McCormack ever speak to you

23    about the two conversations that you had with

24    Ms. Bello?

25         A.    No.

ANDREWS REPORTING SERVICE
(203) 271-2190

1          Q.   So she didn't know whether you were

2    speaking about work or anything else?

3          A.   I can't answer for her.

4          Q.   Did she have a reason to know what you were

5    talking about?

6          A.   I don't believe so.

7          Q.   So the second time Mr. Hood said -- what

8    did he say the second time?

9          A.   This is what Katherine was talking about.

10          Q.   Now, did you have a conversation with

11    Mr. Hood about what you and Ms. Bello were

12    discussing?

13          A.   Yes, we did.

14          Q.   When did you tell him the contents of your

15    conversation?

16          A.   The same day when he made that comment to

17    me.

18          Q.   Was it right there, or was it later in the

19    day?

20          A.   No, it was later on.

21          Q.   And where did this occur?

22          A.   In his office.

23          Q.   And did you go to his office or did he call

24    you to his office?

25          A.   I went to his office.

1     Q.   And what did you say?

2     A.   And Ms. Bello.

3     Q.   Oh, I see.  So you and Ms. Bello went to

4  Kevin's office?

5     A.   Yes.

6     Q.   And how did that conversation start off?

7     A.   Well, basically I told him that I felt

8  uncomfortable with the comment because I felt that

9  what was the problem that -- I'm sorry, let me

10  rephrase my thoughts.

11     Q.   Okay.

12     A.   Basically what I told him was that I was

13  uncomfortable with what he had said because I felt

14  the problem was not that we were talking but the fact

15  that we were talking in Spanish.

16     Q.   Did he respond to that?

17     A.   Yes.

18     Q.   What did he say?

19     A.   He said something to the effect of:  I'm

20  just letting you know how she feels; you do what you

21  have to do.  Because I told him that I was planning

22  to go to Personnel.

23     Q.   And did Ms. Bello say anything throughout

24  this?

25     A.   Yes, she did.  I don't recall what she

1    said.

2         Q.    Was this like at the end of the day before

3    everybody goes home or was it --

4         A.    No.    I believe it was in the afternoon.    I

5    don't recall the time.    Because I know that same day

6    I went to Personnel to file a complaint.

7         Q.    Did anything else happen during this

8    meeting?

9         A.    Anything like?

10        Q.    Do you remember anything else about the

11   meeting?    I think you said you don't remember what

12   Ms. Bello said but she said something.    Did he say

13   anything in response to Ms. Bello; did he say

14   anything else in response to you?

15        A.    Well, basically Ms. Bello agreed with me

16   that it was the fact that we were speaking Spanish

17   that was creating all of the hassle or the

18   complaining.

19        Q.    Now, it doesn't sound like he responded to

20   your concern that the reason you were talked to was

21   because you were speaking in Spanish; is that fair to

22   say?

23        A.    I'm sorry?

24        Q.    Did Kevin Hood kind of sidestep the

25   talking in Spanish issue, or did he address that

```
 1              question.

 2    BY MR. MCQUADE:

 3         Q.    If you see someone talking in --

 4         A.    Excuse me, may I get some water?

 5                    MR. MCQUADE:   Sure.  Let's take a

 6              five-minute break.

 7

 8                    (Break taken:  10:42 am to 10:49 am)

 9                    (Question and Answer read back.)

10

11    BY MR. MCQUADE:

12         Q.    Is it common for employees in the Health

13    Department to have personal conversations during the

14    workday?

15         A.    I think it's common no matter where you

16    work.  If you say good morning, how was your weekend,

17    that's personal.

18         Q.    Sure.  And isn't it common to have the boss

19    come around and say, Hey, get back to work, you've

20    got a job to do here?

21         A.    They have reasons to say this, yes.

22         Q.    Why didn't you interpret Ms. McCormack's

23    directive to be, hey, get back to work?

24         A.    Because I didn't see it as a directive.  I

25    didn't understand it as a directive, her saying get
```

ANDREWS REPORTING SERVICE
(203) 271-2190

1    back to work.

2         Q.    What did you understand it to be?

3         A.    That she didn't like the fact that we were

4    speaking Spanish.

5         Q.    And what led you to that conclusion?

6         A.    If I have conversations with other

7    coworkers in English but the only time I am

8    approached is when I'm having Spanish conversations,

9    I think it's fair to say that that led me to believe

10   that it was the language that I was using.

11        Q.    Were you ever approached during your time

12   at the Health Department by a supervisor concerning

13   any conversations you were having with another

14   coworker?

15        A.    No.

16        Q.    So these two instances were the only

17   instances that you were ever approached by a

18   supervisor in the Health Department concerning a

19   conversation you were having with a coworker?

20        A.    Yes.

21        Q.    Do you know anybody else who was approached

22   by a supervisor concerning conversations they were

23   having with other coworkers?

24        A.    No, not that I recall.

25        Q.    Now, you said before that you went down to

ANDREWS REPORTING SERVICE
(203) 271-2190

43

```
 1      the Personnel Department?

 2            A.    Yes.

 3            Q.    And you filed a complaint?

 4            A.    Yes.

 5            Q.    And that was the same day as the second

 6      conversation you were having with Ms. Bello?

 7            A.    Yes.

 8            Q.    And that was after you spoke to Mr. Hood?

 9            A.    Yes.

10            Q.    And he told you do whatever you have to

11      do?

12            A.    Yes.

13            Q.    And who did you meet with in Personnel?

14            A.    Godfred Ansah.

15            Q.    And what did you tell Mr. Ansah?

16            A.    I told him that I wanted to file a

17      complaint.

18            Q.    Had you been disciplined as a result of

19      having these conversations with Ms. Bello?

20            A.    What's your definition of "disciplined"?

21            Q.    Did you consider you were disciplined as a

22      result of your conversations with Ms. Bello?

23            A.    Yes.

24            Q.    And why was that?

25            A.    The fact that I was denied training after I
```

1    filed this complaint.

2        Q.    But that was later down the road?

3        A.    Yes.

4        Q.    But at the time you had these two

5    conversations with Ms. Bello, did anyone ever tell

6    you that they were going to take disciplinary action

7    against you?

8        A.    No.

9        Q.    Is it fair to say you were told to get back

10   to work?

11       A.    Honestly, I can't answer that question.

12       Q.    Were you ever given an oral reprimand for

13   your conversations with Ms. Bello?

14       A.    I'm not too sure.

15       Q.    Did anyone tell you I'm giving you an oral

16   reprimand based on these conversations with

17   Ms. Bello?

18       A.    No.

19       Q.    Were you ever given a written reprimand as

20   a result of these conversations with Ms. Bello?

21       A.    No.

22       Q.    Were you ever suspended as a result of

23   these conversations with Ms. Bello?

24       A.    No.

25       Q.    Obviously you weren't fired as a result of

45

```
 1        these conversations with Ms. Bello, correct?

 2            A.    Correct.

 3            Q.    And you were not reassigned as a result of

 4        these conversations with Ms. Bello, correct?

 5            A.    Were not what, I'm sorry?

 6            Q.    You were not reassigned to a different

 7        position as a result of these conversations with

 8        Ms. Bello?

 9            A.    No.

10            Q.    So you went to see Godfred Ansah and what

11        did you tell him?

12            A.    That I wanted to file a complaint.

13            Q.    And what was his response?

14            A.    He asked me what the complaint was in

15        regards to.

16            Q.    And what did you tell him?

17            A.    What did I tell him?

18            Q.    Yes.

19            A.    I told him what had happened.

20            Q.    And you wrote it down in a complaint form,

21        correct?

22            A.    Yes.

23            Q.    And what happened with that complaint?

24            A.    It was submitted to Personnel and,

25        supposedly, an investigation took place.
```

46

```
1              MR. MCQUADE:  Let's mark this.

2

3              (Defendant's Exhibits 2 and 3:  Marked

4         for identification.)

5

6    BY MR. MCQUADE:

7         Q.   I'm going to show you what's been marked

8    as Exhibit 2 to this deposition.  Do you recognize

9    it?

10        A.   Yes.

11        Q.   And what is it?

12        A.   It's a Complaint Intake Form.

13        Q.   And this is the Complaint Intake Form that

14   you filled out and gave to Dr. Ansah; is that

15   correct?

16        A.   Yes.

17        Q.   And did Dr. Ansah tell you what to write

18   here?

19        A.   No.

20        Q.   Did you ever ask Kevin Hood whether he was

21   speaking to you about your conversations with

22   Ms. Bello because they were in Spanish?

23        A.   I don't recall asking him.

24        Q.   Now, you said that supposedly an

25   investigation occurred?
```

```
 1          A.    Yes.

 2          Q.    What do you mean by that?

 3          A.    What do I mean by?

 4          Q.    Supposedly an investigation occurred?

 5          A.    Supposedly?

 6          Q.    Yes.

 7          A.    I never received any information regarding

 8    the outcome of the investigation.

 9          Q.    I am going to show you what we have marked

10    as Exhibit 3 to this deposition.  Do you recognize

11    it?

12          A.    No.  I've never seen this before.

13          Q.    So you have never seen this document

14    before?

15          A.    I don't recall it, no.

16          Q.    In the third paragraph -- well, this is a

17    document dated April 7th, 1999 directed To Whom it

18    May Concern signed by Godfred T. Ansah, Personnel/EEO

19    Officer.

20                It says in the third paragraph, "The

21    investigation did not substantiate Ms. Aquino's

22    allegation.  There was no harassment by Mr. Hood.

23    Instead, Mr. Hood was trying to assist Ms. Aquino to

24    qualify for career advancement."

25                Did Dr. Ansah ever tell you that your
```

```
1    allegations were found not to be substantiated?

2         A.   No.

3         Q.   Did you ever find out what happened with

4    the investigation?

5         A.   No.

6         Q.   Did you ever contact Dr. Ansah and ask him

7    about the status of the investigation?

8         A.   I believe I did.

9         Q.   Do you know when that was?

10        A.   1999.

11        Q.   You don't recall what month or day?

12        A.   (Witness shaking head in the negative.)

13        Q.   Is that a no?

14        A.   Oh, I'm sorry.  No.

15        Q.   And was that by phone or in person?

16        A.   It was by phone.

17        Q.   Then did you speak to Dr. Ansah or did you

18   leave a message?

19        A.   Left a message.

20        Q.   Did you receive a return phone call?

21        A.   Not that I recall.

22        Q.   Did you place any other phone calls to

23   Dr. Ansah concerning this investigation?

24        A.   Not that I recall.

25        Q.   Now, this says, and this is in Exhibit 3,
```

49

1    the final paragraph, "A draft of the report of the

2    investigation is to be discussed when Ms. Aquino

3    returns from maternity leave." Did that, in fact,

4    happen?

5        A.    No.

6        Q.    So as a result of this complaint, you only

7    called Dr. Ansah once concerning this?

8        A.    As far as I recall.

9        Q.    So is it fair to say you were not terribly

10   concerned about the outcome of the complaint?

11       A.    No, I wouldn't say that.

12       Q.    Why not?

13       A.    Because if I wasn't concerned about the

14   outcome, I wouldn't have called Mr. Ansah.  I think

15   it's his duty and I shouldn't have to be calling

16   more than once.  I think one phone call should

17   have been enough for him to at least return my phone

18   call.

19       Q.    But you only called once; is that correct?

20       A.    As I recall.

21       Q.    Did you ever speak to Ms. McCormack about

22   the complaint that you filed?

23       A.    I don't recall, no.

24       Q.    Were you interviewed by Dr. Ansah after the

25   day you made the complaint regarding this complaint

1    or investigation?

2        A.    I don't recall a second interview regarding

3    this complaint.

4        Q.    Did you give Dr. Ansah a list of names to

5    contact?

6        A.    Yes.

7        Q.    And who did you tell him to contact?

8        A.    Ms. Bello.

9        Q.    Anybody else?

10        A.    I don't recall if I gave him any other

11    names.

12        Q.    And do you know if he spoke to Ms. Bello?

13        A.    I don't know.

14        Q.    You didn't follow up with her, correct?

15        A.    No, I don't believe so.

16        Q.    Do you know whether anybody else was

17    contacted with regard to the investigation of your

18    complaint?

19        A.    No, I don't know.

20        Q.    So you filed a complaint with Dr. Ansah,

21    correct?

22        A.    Yes.

23        Q.    And the only follow-up you did was to call

24    him once and to leave a message, correct?

25        A.    Yes.

1        Q.   And you gave Dr. Ansah Ms. Bello's name as

2    someone to contact regarding the investigation,

3    correct?

4        A.   Yes.

5        Q.   And you never asked Ms. Bello whether she

6    had been contacted by Dr. Ansah?

7        A.   No, I didn't.

8        Q.   So is it fair to say this was not very

9    important to you?

10              MS. CORRIVEAU:  Objection.

11              THE WITNESS:  No, it's not fair to

12         say.

13    BY MR. MCQUADE:

14        Q.   And you never received word as to what the

15    results of the investigation were, correct?

16        A.   No.

17        Q.   And you never asked beyond the one phone

18    message that you left for Dr. Ansah, correct?

19        A.   Not that I recall.

20        Q.   Let me show you what's been marked as

21    Exhibit 1.  Do you recognize this document?

22        A.   (Reviewing).

23              MS. CORRIVEAU:  The question was do

24         you recognize the document.

25              THE WITNESS:  Yes.

```
 1    BY MR. MCQUADE:

 2         Q.   And what is it?

 3         A.   It's a complaint.

 4         Q.   It's your complaint, right?

 5         A.   Yes.

 6         Q.   And you have seen this document before,

 7    correct?

 8         A.   Yes.

 9         Q.   In paragraph 1 you say that you were

10    discriminated against on the basis of your race and

11    gender, correct?

12         A.   Yes.

13         Q.   And that your race is Hispanic; is that

14    correct?

15         A.   Yes.

16         Q.   And that your gender is female, correct?

17         A.   Yes.

18         Q.   The second sentence in paragraph 1 says,

19    "The plaintiff was less trained, not promoted to the

20    position of Public Health Sanitation and Inspection,

21    and retaliated against by the Defendant because of

22    her sex, female, her pregnancy, her ancestry,

23    Puerto Rican, and her previous opposition to

24    Defendant's discriminatory conduct towards her, all

25    in violation of Title VII of the Civil Rights Act
```

53

1    of 1964."

2           Now, when you say you were not promoted to

3    the position of Public Health Sanitation and

4    Inspection, what position are we talking about?

5           A.    The lead inspector position.

6           Q.    That's the Public Health Sanitarian

7    Inspector position, correct?

8           A.    Yes.

9           Q.    We are not talking about the Public Health

10   Sanitarian position?

11          A.    Not for food inspections, no.

12          Q.    It's fair to say the Public Health

13   Sanitarian is a higher position than the Public

14   Health Sanitarian Inspector; is that right?

15          A.    It's, yes.

16          Q.    And you get more to be the sanitarian as

17   opposed to the inspector, correct?

18          A.    Yes.

19          Q.    So we're only talking about the Public

20   Health Sanitarian Inspector position in this lawsuit,

21   correct?

22          A.    Public Health Sanitarian Inspector, yes.

23          Q.    Now, one of the things you were talking

24   about is your "previous opposition to Defendant's

25   discriminatory conduct towards her."  What does that

1    mean?

2         A.   I'm sorry, where are you reading from?

3         Q.   We're still in the second sentence of
4    paragraph 1.

5         A.   I'm sorry, what is your question again?

6         Q.   What do you mean by "her previous
7    opposition to Defendant's discriminatory conduct
8    towards her"?

9         A.   I don't want to assume, I want to make sure
10   I understand what I'm reading.

11        Q.   I fully concur.

12        A.   (Reviewing).  If I remember correctly, this
13   is referring to the defendant's discriminatory
14   conduct towards myself was in regards to those
15   incidents of my conversations with Ms. Bello.

16        Q.   So you felt that the City of Hartford
17   Health Department discriminated against you because
18   of your conversations with Ms. Bello, correct?

19        A.   Because of my Spanish conversations with
20   Ms. Bello.

21        Q.   And how did they discriminate against you?

22        A.   Well, the fact that I was called and talked
23   to about these two particular conversations.

24        Q.   But as we established, you weren't
25   disciplined as a result of this, correct?

ANDREWS REPORTING SERVICE
(203) 271-2190

55

```
1        A.   Not directly.

2        Q.   Were you indirectly discriminated against?

3        A.   No, I said not indirectly -- we're not

4   talking about the discrimination, we're talking about

5   whether they took any action against me.  Right?

6        Q.   Now I'm confused.

7             MS. CORRIVEAU:  The discipline.

8             THE WITNESS:  Right, the discipline,

9             that's what I'm talking about.  When I said

10            not directly, they didn't discipline me

11            directly but they did indirectly.

12  BY MR. MCQUADE:

13       Q.   And how did they indirectly discriminate

14  against you?

15       A.   How did they -- I'm sorry, you have to --

16            MS. CORRIVEAU:  Discipline, not

17            discriminate.

18            THE WITNESS:  We are talking about the

19            discipline.

20  BY MR. MCQUADE:

21       Q.   You were not disciplined as a result of

22  your conversations with Ms. Bello, correct?

23       A.   Right.

24       Q.   Were you otherwise discriminated against as

25  a result of not your conversations with Ms. Bello but
```

ANDREWS REPORTING SERVICE
(203) 271-2190

```
 1              identification.)

 2

 3    BY MR. MCQUADE:

 4         Q.   I'm going to show you what's been marked as

 5    Exhibit 4.  Do you recognize this document?

 6         A.   (Reviewing).  Yes.

 7         Q.   And what is it?

 8         A.   It's an affidavit.

 9         Q.   And it was submitted to the Connecticut

10    Commission on Human Rights and Opportunities,

11    correct?

12         A.   Yes.

13         Q.   And it's dated February 18, 1999, correct?

14         A.   Yes.

15         Q.   So in the Complaint, which was Exhibit 1,

16    where you say you filed timely charges with the State

17    of Connecticut Commission on Human Rights and

18    Opportunities on or about February 18, 1999,

19    Exhibit 4 is a copy of the document that you

20    submitted, correct?

21         A.   Yes.

22         Q.   This is your CHRO complaint, correct?

23         A.   Yes.

24         Q.   And I notice that the language in Exhibit 4

25    is very similar to the language in Exhibit 1.  Who
```

ANDREWS REPORTING SERVICE
(203) 271-2190