```
 1   particular that jogged that memory?
 2        A.   I just remember.
 3        Q.   All right.  Staying with the
 4   interrogatories, which I believe are Exhibit 5.
 5   No. 10 on the same page.  I've asked you, "Have you
 6   asserted a hostile work environment claim.  If so,
 7   identify the counts in which a hostile work
 8   environment claim is asserted."
 9             And the response is, "Objection - calls for
10   a legal conclusion."
11             So I want to know are you claiming a
12   hostile work environment in this lawsuit?
13                  MS. CORRIVEAU:  I would maintain my
14                  objection.  If you would define what you
15                  want that to mean to her.
16   BY MR. MCQUADE:
17        Q.   Do you know what a hostile work environment
18   claim is?
19        A.   Now I know.
20        Q.   What is it?
21        A.   Basically, my understanding is that a
22   hostile work environment is anything that makes you
23   feel uncomfortable, that deprives you from doing your
24   job.  I guess I could say it could be considered a
25   hostile work environment.
```

1      Q.    And I'm asking you are you seeking money

2   from the City of Hartford based on a hostile work

3   environment?

4      A.    I'm not too comfortable with your question

5   because you're asking me if I'm seeking money?

6      Q.    Right.

7      A.    I'm filing a complaint based on

8   discrimination because I was denied a position, and I

9   believe that my gender, my race, and the fact that I

10   was pregnant at the time were reasons for that

11   denial.

12      Q.    You can probably appreciate my position; I

13   get this complaint and I want to know why it is

14   you're seeking money from the City of Hartford and

15   how it is that you're seeking money from the City of

16   Hartford.  And so I asked are you asserting a hostile

17   work environment claim and there's an objection to

18   that.  Well, in our system there's not supposed to be

19   surprises at trial.

20          So I'm just asking are you asserting a

21   hostile work environment claim?  Are you asserting

22   that you were sexually harassed by the City of

23   Hartford?

24      A.    Am I asserting that I was what, I'm sorry?

25      Q.    Sexually harassed?

ANDREWS REPORTING SERVICE
(203) 271-2190

1    A.    Sexually harassed?

2    Q.    Yes.

3    A.    What does the word "sexual" have to do with

4    it?  I don't understand.

5    Q.    Have you heard of the phrase "sexual

6    harassment"?

7    A.    Yes, I have.

8    Q.    And those could be unwelcome advancements

9    in the workplace, an environment that's so sexually

10    charged that you can't do your work, things of that

11    nature.  Typically it arises when a manager who makes

12    rude comments or comes on to somebody or makes

13    advancement dependent upon some kind of romantic or

14    sexual relationship or something like that.

15         So I'm asking are you claiming that you

16    were sexually harassed in this lawsuit?

17    A.    No, I am not.

18    Q.    Okay.

19    A.    Can I ask you a question?  Hostile work

20    environment, does it just relate to sex?

21    Q.    Well, my next question is are you claiming

22    that the City of Hartford created a hostile work

23    environment based on race?

24              MS. CORRIVEAU:  Objection.

25              You can go ahead.

ANDREWS REPORTING SERVICE
(203) 271-2190

```
 1              THE WITNESS:  My understanding of
 2          hostile work environment, yes.  If I feel I
 3          am treated different or looked at
 4          differently or my conversations are paid
 5          attention to more because they happen to be
 6          in Spanish, yes, I would say I feel it is a
 7          hostile work environment.
 8   BY MR. MCQUADE:
 9       Q.   So if I understand correctly, you are
10   claiming in this lawsuit that you were subjected to a
11   hostile work environment based on your race, that
12   being Hispanic, correct?
13       A.   If harassment leads to hostility, yes.  If
14   discrimination leads to hostility, yes.
15       Q.   But you're not claiming that you were
16   sexually harassed?
17       A.   I am not claiming that I was sexually
18   harassed.
19       Q.   Okay.  Why don't we go back to the
20   complaint, which is Exhibit 1.  In paragraph 15 you
21   say, "Before she left for maternity leave, the
22   Plaintiff spoke to both Owen Humphries and her
23   immediate supervisor Kevin Hood, regarding the Lead
24   Inspector application process.  Both men assured her
25   that they were 'working on' filling the position, and
```

1   that she would be afforded the opportunity to apply

2   for the position."

3            Did anyone tell you when the position would

4   be posted?

5       A.   That position was vacant twice, so are we

6   talking about the first time it was vacant or the

7   second time?

8       Q.   Well, in paragraph 14 you say, "In or about

9   November, 1997, the Plaintiff temporarily left her

10  employ for a two month maternity leave." So I'm

11  assuming we're talking about the December 1997

12  posting for the position.

13      A.   If we are talking about the first vacant

14  position for which I was applying before I went

15  on maternity leave or which Mr. Ellison was hired,

16  no, I was not told as to when it was going to be

17  posted.

18      Q.   Did anyone ever tell you that we're

19  going to call you when you're out on your maternity

20  leave to let you know that the position has been

21  posted?

22      A.   No.

23      Q.   And you were familiar with the posting

24  process, correct?

25      A.   Yes.

1      Q.    And you know that --

2      A.    Somewhat, yes.

3      Q.    And you had been at the city for at least

4  two years by that time, correct?

5      A.    About, yes.

6      Q.    And do you understand that the normal

7  process is that the position is posted and there's an

8  application process, the application period has ended

9  and then testing is done thereafter?  Do you

10  understand that?

11      A.    That's the normal process.

12      Q.    Okay.

13      A.    However, it's not always the way.

14      Q.    Okay.  All right.  You said you were told

15  you would be afforded the opportunity to apply for

16  the position, right?

17      A.    Yes.

18      Q.    In fact, there was a posting.  Correct?

19      A.    I believe so.

20            MR. MCQUADE:  Let's mark this as

21      Defendant's Exhibit 7.

22

23            (Defendant's Exhibit 7:  Marked for

24      identification.)

25  BY MR. MCQUADE:

1          Q.   I am going to show you what has been marked

2     as Defendant's Exhibit 7.  Have you ever seen this

3     before?

4          A.   It looks familiar, yes.

5          Q.   It looks like a posting for the Public

6     Health Sanitarian Inspector position; is that right?

7          A.   Yes.

8          Q.   And at the bottom in the left-hand corner

9     it says "Issued 12/4/97."  Do you see that?

10         A.   Yes.

11         Q.   So this would appear to be a posting for

12    the lead inspector position that was posted on

13    December 4, 1997 and that applications would be

14    accepted until Friday, December 19th, 1997.  Do you

15    see that?

16         A.   Yes.

17         Q.   And it's fair to say that you never

18    submitted an application in response to this posting,

19    correct?

20         A.   I was on maternity leave at the time.

21         Q.   My question is, you never filed an

22    application in response to this posting, correct?

23         A.   Right.  That's correct.  I was not able to.

24         Q.   Why were you not able to?

25         A.   Because I was on maternity leave.

1      Q.    When did you have your baby?

2      A.    December 2nd.

3      Q.    And how long were you out on maternity

4    leave?

5      A.    I believe I was out about three months.

6      Q.    How long after the birth of your child on

7    December 2nd, 1997 were you hospitalized, if you

8    recall?

9      A.    I was in the hospital after I had the baby

10   for two days.

11     Q.    So it was a pretty standard birth?

12     A.    Right.

13     Q.    And was it a natural birth?

14     A.    Yes.

15     Q.    And during your maternity leave, were you

16   at home after you left the hospital?

17     A.    Yes.

18     Q.    And at the time, where was your home?

19     A.    I was in Bristol.

20     Q.    So is it fair to say that before

21   December 19th you could have gotten in the car and

22   gone and filed an application at the Personnel

23   Department, even though you're on maternity leave?

24     A.    No.

25     Q.    Why not?

ANDREWS REPORTING SERVICE
(203) 271-2190

1      A.    After having a baby, you know, my baby

2  becomes my priority.

3      Q.    I agree with that fully, but there was

4  nothing that prevented you from taking an hour,

5  whatever, even taking the baby, going to the

6  Personnel Department and filing an application?

7      A.    Well, I was not aware that the position had

8  been posted.

9      Q.    You were not aware of the position being

10 posted, had been post --

11     A.    Had been posted.

12     Q.    So you didn't know to come and file an

13 application?

14     A.    No, I didn't.

15     Q.    And no one ever told you that they were

16 going to call you and tell you, hey, the posting

17 happened, correct?

18     A.    Not that I recall.

19     Q.    So you're out on maternity leave, you

20 didn't file an application, and someone else got the

21 position.  Correct?

22     A.    Yes.

23     Q.    Is there anything discriminatory with

24 respect to that process concerning you?

25     A.    I mean, not the way you're presenting it.

1      Q.   Would you present it differently?

2      A.   From my point of view, yes.

3      Q.   And how is that?

4      A.   Well, you have someone who has performed

5   the job, you know that this person has shared with

6   you the interest of filling that position, and that

7   you know that this person is coming back to work, and

8   yet you go on and open the job and close it so

9   this -- it's unusual for positions to open and close

10   in such a short time frame.  For the most part they

11   are not that short of a posting and closing date.

12      Q.   What do you think is the typical posting

13   and closing date timelines?

14      A.   About 30 days.

15      Q.   About 30 days, okay.

16      A.   Just for the application process.  Not

17   taking into consideration qualifying the best

18   candidates and the whole process.

19      Q.   Right, just the application process?

20      A.   Right.

21      Q.   Are you aware that some of these open and

22   close in two or three days?

23      A.   Very unusual.

24      Q.   Now, it's fair to say that the Personnel

25   Department does the posting, correct?

1        A.    Yes.

2        Q.    And it's fair to say that the Personnel

3   Department does the testing, correct?

4        A.    Yes.

5        Q.    And usually at the end it's the department

6   head who does the interview and makes the selection,

7   correct?

8        A.    Yes.

9        Q.    And are you aware that there are personnel

10  rules and regulations for the City of Hartford?

11       A.    Yes.

12       Q.    And are you aware that they are obligated

13  to post open positions?

14       A.    That they are obligated, or indeed do they?

15  Because then we are talking about two different

16  things.

17       Q.    Well, you're aware they are obligated to

18  post open positions when they are funded and the

19  budget so allows?

20       A.    Not always the case.

21       Q.    Paragraph 16 of the Complaint says, "When

22  Plaintiff returned to work in February of 1998, the

23  Defendant had filled the vacant Lead Inspector

24  position, thereby denying her the opportunity to

25  apply for this position."

ANDREWS REPORTING SERVICE
(203) 271-2190

1  mechanism would be?

2       A.   Very discouraging.  You would have to

3  submit paperwork.  And I was told that it hardly ever

4  was approved and that it was a very long process.

5                 MR. MCQUADE:  Let's mark this,

6            please.

7

8                 (Defendant's Exhibit 10:  Marked for

9            identification.)

10

11  BY MR. MCQUADE:

12       Q.   Let me show you what's been marked as

13  Exhibit 10 to this deposition.  Do you recognize it?

14       A.   Yes.

15       Q.   And what is it?

16       A.   It's a memo from the Department of Health.

17       Q.   And there's some handwriting on it,

18  correct?

19       A.   Yes.

20       Q.   Whose handwriting is that?

21       A.   Which one are you talking about?

22       Q.   The handwriting in the upper right-hand

23  corner.

24       A.   Owen Humphries.

25       Q.   And is it fair to say this was a note to

ANDREWS REPORTING SERVICE
(203) 271-2190

1    you from Owen?

2        A.    Yes.

3        Q.    And he asked you on October 27th to call to

4    attend the course that was being offered, correct?

5        A.    Yes.

6        Q.    Now, did you call someone?

7        A.    Yes, I did.

8        Q.    Who did you call?

9        A.    The name of the person that's written at

10   the bottom.

11       Q.    Oh, is that Carmela?

12       A.    Yes.

13       Q.    And is that your handwriting?

14       A.    Yes.

15       Q.    And what did Carmela tell you?

16       A.    She took my name down.  And I believe she

17   told me that it was all set for me to attend the

18   training.

19       Q.    Did you have any further conversations with

20   Carmela or anybody else?

21       A.    I don't recall, no.

22       Q.    It says in your complaint in Paragraph 28,

23   "On November 2, 1998, the Plaintiff submitted a

24   request to her supervisor, Kevin Hood, that she be

25   permitted to attend the RMD-XRF training; on

1   November 5, 1998, the Plaintiff's request was denied.

2   Defendant's alleged reason for said denial was that

3   the training did not fall within her job

4   description."

5            MR. MCQUADE:  Let's mark that as an

6        exhibit.

7

8          (Defendant's Exhibit 11:  Marked for

9        identification.)

10

11  BY MR. MCQUADE:

12      Q.    I'm handing you what's been marked as

13  Plaintiff's Exhibit 11 to this deposition.  Do you

14  recognize it?

15      A.    Yes.

16      Q.    What is it?

17      A.    It's a request for training.

18      Q.    Is this a standard form?

19      A.    Yes.

20      Q.    And why did you submit it?

21      A.    Because Kevin was my immediate supervisor,

22  the request was being made by Owen Humphries so I

23  needed my immediate supervisor's authorization.

24      Q.    And was Owen Kevin's supervisor?

25      A.    No.  If I can use the word "weird"

ANDREWS REPORTING SERVICE
(203) 271-2190

113

 1   situation.  Owen was basically in charge of the lead

 2   program, although Kevin was above Owen.  It was

 3   almost like they were at the same level, I guess.

 4        Q.   Okay.

 5        A.   But Owen took basically all of the

 6   responsibilities and decisions for the lead program,

 7   pretty much.  But because Mr. Hood was the program

 8   coordinator that was overseeing the lead program, he

 9   was the person that would have to authorize the

10   training.

11        Q.   So Owen wanted you to take the training but

12   you had to get approval from Kevin?

13        A.   Yes.

14        Q.   And it looks like there's a note from Kevin

15   here; is that correct?

16        A.   Yes.

17        Q.   It says, "This is not within your job

18   description."  Is that correct?

19        A.   Yes.

20        Q.   How did you find out about this?

21        A.   About what?

22        Q.   What did you take "this is not within your

23   job description" to mean?

24        A.   I'm not sure I understand what you're

25   asking me.

1        Q.    Does that mean come talk to me or does that

2    mean this is denied?

3        A.    Oh, I took it as denied.

4        Q.    And why is that?

5        A.    It's the first time that he had denied any

6    participation in something that was not within my job

7    description.

8        Q.    Well, did you go and ask him whether it was

9    denied, or what did you do once you got this piece of

10   paper back?

11       A.    I believe I went back and asked him.

12       Q.    And what did he say, or what did you say?

13       A.    I believe he said that it was a management

14   decision, and that's when I contacted the deputy

15   director.

16       Q.    How did you contact the deputy director?

17       A.    I believe I went by her office and asked

18   her -- asked to talk to her.

19       Q.    And what happened with her?

20       A.    I don't recall if we met on the same day

21   or not but I explained to her what had happened.

22   And I was very surprised when she asked me if I

23   believed that my pregnancy had something to do with

24   it.

25       Q.    She asked you whether --

1    A.    When I explained to her that I had been

2    denied the training, you know, we talked about the

3    fact that I had been doing lead inspections, she

4    didn't understand why I was being denied this

5    training so she asked me if I believed that my

6    pregnancy had something to do with it.

7    Q.    And who was the assistant director at that

8    time?

9    A.    Ponn Mahon -- I can't pronounce her name.

10    Q.    Is it M-a-h-a-y-o --

11    A.    M-a-h-a-y-o-s-n-a-n-d, if that's spelled

12    correct.

13    Q.    Why don't we just call her --

14    A.    Ponn.

15    Q.    -- Ponn for now.

16    A.    Okay.

17    Q.    So Ponn asked you if you thought your

18    pregnancy had anything to do with it?

19    A.    Yes.

20    Q.    When was that?

21    A.    That was during the meeting that she and I

22    had after the denial of the training.

23    Q.    Let's go back to Exhibit 8.  On the third

24    page of Exhibit 8 there's a memo dated November 5,

25    1998.  And when was this created?

ANDREWS REPORTING SERVICE
(203) 271-2190

1      A.    November 5th.

2      Q.    So you created this document after you

3  talked to Kevin?

4      A.    Yes.

5      Q.    The last sentence you say, "However today

6  in the staff meeting I asked him if I could attend

7  the training that Sally Odle is teaching at CRT on

8  Lead Abatement and he said that I could."

9            Who is Sally Odle?

10     A.    She does lead abatement projects for

11  people that are property owners that are cited for

12  lead.

13     Q.    She's like a private contractor?

14     A.    Yes.

15     Q.    And what's CRT?

16     A.    Community Renewal Team.

17     Q.    And so what was this program on lead

18  abatement?

19     A.    Lead abatement.

20     Q.    And he said you could go to that?

21     A.    Yes.

22     Q.    Now, this was on the same day as he denied

23  your request to go to the XRF training; is that

24  correct?

25     A.    Yes.

1      Q.   And did you actually go to this training

2   offered by Sally Odle?

3      A.   Yes.

4      Q.   And when was that?

5      A.   I don't recall the date.

6      Q.   Was that a free seminar?

7      A.   It was free to me.

8      Q.   You don't know if the city paid for that

9   training or not?

10      A.   I believe she had a contract with the state

11   so I believe it was also paid by the state.

12      Q.   And on the same day, November 5th, 1998,

13   Kevin announced that the lead inspector position

14   would be posted, right?

15      A.   I don't remember.  During this meeting?

16      Q.   Yes, I'm reading on Exhibit 8.

17      A.   My notes, right?

18      Q.   Right.

19      A.   Yes, okay, if I wrote it there.

20      Q.   So he announced the posting would be made

21   for the lead inspector position and then denied your

22   training request on the XRF, correct?

23      A.   Denied my request to attend the XRF

24   training.  He announced, according to my notes, he

25   announced that the lead inspector's position being

1    available.  And he also authorized me to go to the

2    lead abatement training.

3         Q.   Now, the lead abatement training, was that

4    a low-level training, was that an introductory

5    course?  What kind of training was Sally Odle doing?

6         A.   It was a lead abatement training to give

7    the inspectors and property owners, you know,

8    valuable information as to the best ways to meet the

9    plan and abate.

10        Q.   Was one training better than the other?

11        A.   Not to my opinion.

12        Q.   So he would like you to go to one of the

13   training sessions but not the other?

14        A.   Yes.

15        Q.   If we go to the next page of Exhibit 8, it

16   starts, "Today, November 20, 1998 at 3:00 P.M. I met

17   with Deputy Director Ponn because I wanted her to

18   review the denial for training I had received from

19   Mr. Hood.  According to him the training was denied

20   because it was out of my job classification.  When I

21   met with Ponn I informed her that the training was a

22   completion for the lead inspector position; that the

23   training was sponsored by the state; therefore it was

24   free of charge to the city.  I also informed her that

25   Owen had given me the information regarding the

1      A.    No.

2      Q.    Was any grievance filed on your behalf?

3      A.    Not that I know of.

4      Q.    Did you ever file a grievance while you

5    were in the Health Department?

6      A.    No.

7      Q.    Have you ever filed a grievance while you

8    were employed by the City of Hartford?

9      A.    No.

10      Q.    In paragraph 30 of the complaint,

11    Exhibit 1, you're talking about how Ponn asked when

12    your baby was due and how long you were planning to

13    be out on maternity leave.  Then the last sentence

14    states, "These queries from Ponn" -- we'll leave

15    it at that, her name -- "give rise to an inference

16    that the Plaintiff's pregnancy was related to

17    Defendant's refusal to deny the Plaintiff the

18    RMD-XRF training."

19          How do you arrive at that conclusion?

20      A.    Why would she be asking me those

21    questions and why would she be asking me if I

22    believed my pregnancy had something to do with it?

23    You just don't come out of nowhere asking those

24    questions.

25      Q.    Is it fair to say she was asking you

ANDREWS REPORTING SERVICE
(203) 271-2190

1    or with Personnel?

2       Q.   Right, union, Personnel.  Did you do

3    anything else, complain to anybody else, take any

4    other action as a result of --

5       A.   I basically expressed my frustration to my

6    coworkers.

7       Q.   But you didn't go to see Ms. McCormack,

8    right?

9       A.   No.

10       Q.   Do you know if anyone else had applied for

11    the XRF training there from the city?

12       A.   Not to my knowledge.

13       Q.   When you went to the Sally Odle training,

14    were there others there from the city?

15       A.   Mr. Ellison and Mr. Crudup.

16           MR. MCQUADE:  Why don't we mark this

17         as 12.

18

19           (Defendant's Exhibit 12:  Marked for

20         identification.)

21

22    BY MR. MCQUADE:

23       Q.   You have been shown what's been marked as

24    Exhibit 12 to this deposition.  Do you recognize

25    that?

1          A.    It's a job posting.

2          Q.    It's for the Public Health Sanitarian

3     Inspector position, correct?

4          A.    Yes.

5          Q.    Now that's the lead inspector position,

6     correct?

7          A.    Yes.

8          Q.    And in the bottom left-hand corner it says

9     it's issued 11/25/98, correct?

10          A.    Yes.

11          Q.    And applications will be accepted until

12     Friday, December 18, 1998, correct?

13          A.    Yes.

14          Q.    So this one was open about, what, three

15     weeks, something like that?

16          A.    I could be wrong but I think there was

17     another posting that came out with a deadline at the

18     end of the month.

19          Q.    Do you recall seeing this posting?

20          A.    I don't remember if I saw it or someone

21     told me about it.

22          Q.    Do you remember reading the posting?

23          A.    Yes.

24          Q.    And did you read it prior to submitting

25     your application?

1      A.    I don't know if I read it before or after

2  my application.

3      Q.    Okay.  How did you get the application?

4      A.    I believe I had blank applications at my

5  work area.

6      Q.    So you could just fill it out and put in

7  the relevant information?

8      A.    Yes.

9      Q.    And in this posting which we have marked as

10  Exhibit 12, it states the qualifications are

11  "Graduation from a standard high school, or its

12  equivalent, supplemented by two years of college.

13  Two years responsible experience in the field of

14  public health sanitation, involving public contact.

15  Wherever possible, appropriate equivalents will be

16  considered."

17          Do you know if you read that before filing

18  your application, the qualifications?

19      A.    I don't remember which one I did first.

20      Q.    So you don't recall whether you read it

21  before filing the application, correct?

22      A.    No, I don't.  Most likely I read it before

23  but I don't recall.

24              MR. MCQUADE:  Why don't we mark this.

25

1              (Defendant's Exhibit 13:  Marked for

2         identification.)

3

4    BY MR. MCQUADE:

5         Q.    You have been handed what's been marked as

6    Exhibit 13 to this deposition.  Do you recognize this

7    document?

8         A.    Yes.

9         Q.    And what is it?

10        A.    It's an application for employment.

11        Q.    And employment to what position?

12        A.    Public Health Sanitarian Inspector.

13        Q.    And is it fair to say that this application

14   was filed in response to the posting we have marked

15   as Exhibit 12?

16        A.    Probably, yeah.  Because it has the exam

17   number.  And I wouldn't know what the exam number is

18   if I didn't have that exam number.

19        Q.    If you look on Exhibit 12 in the lower

20   left-hand corner it shows an exam number?

21        A.    Yes.

22        Q.    What's the exam number?

23        A.    2074.

24        Q.    What's the exam number noted on your

25   application?

ANDREWS REPORTING SERVICE
(203) 271-2190

1      A.     2074.

2      Q.     So it's fair to say this application was

3    submitted in response to the posting we have marked

4    as Exhibit 12?

5      A.     Yes.

6      Q.     And I want you to go through and show me

7    where your application reveals that you have

8    completed two years worth of college?

9      A.     Where it says section D, "List any

10   colleges, business schools, or technical schools you

11   attended."

12     Q.     Okay.  Does it show the number of credits

13   you have accumulated?

14     A.     No.  It shows years of attendance.

15     Q.     But it doesn't show progress towards

16   completion of a college degree, correct?

17     A.     It doesn't show number of credits, no.

18     Q.     And you did not submit with your

19   application a transcript, correct?

20     A.     I don't believe so, no.  No, because it

21   didn't call for it in the application.

22     Q.     If you could go through Exhibit 13 and show

23   me where it demonstrates that you have two years of

24   experience in public health sanitation, please let me

25   know?

```
 1        A.    The "Experience" section, 10, where it says
 2   I have worked for the Health Department since 12 of
 3   '96 to present, which was '98.   That was two years.
 4        Q.    But you didn't start doing the -- you
 5   didn't start going out with the lead inspectors until
 6   February of 1997, correct?
 7        A.    Correct.
 8        Q.    So obviously that's less than two years,
 9   correct?
10        A.    Correct.
11        Q.    So you did not have two years of experience
12   assisting the lead inspectors by the time you filed
13   this application, correct?
14              I'm sorry, is that correct or incorrect?
15        A.    Oh, correct.
16        Q.    It shows that you had two years of
17   experience as a senior clerk-typist in the Hartford
18   Health Department, correct?
19        A.    It showed that I had two years of
20   experience working in the Health Department.
21        Q.    Right.  And that the application reflects
22   that your last job title was senior clerk-typist,
23   correct?
24        A.    Correct.
25        Q.    And then in your duties you talk about
```

ANDREWS REPORTING SERVICE
(203) 271-2190

134

1    "Performed epidemiological and lead investigation

2    under the supervision of the current lead inspectors.

3    Provided educational material to families to help

4    them prevent further lead poisoning to their

5    children.  Prepare orders to owners for abatement of

6    lead.  Serve as liaison between medical providers,

7    state agencies, community agencies.  Type monthly

8    report and other letters, forms, affidavits for

9    completion of abatement.  Attend court, etc."

10             But it doesn't say how long you performed

11   the epidemiological and lead examination under the

12   supervision of current lead inspectors; is that

13   correct?

14        A.   Well, not in that particular space, but up

15   on top it says.  Where it says 12/96 to present.

16        Q.   And is it fair to say that from 12/96 to

17   the present that reflects that your job title was a

18   senior clerk-typist?

19        A.   Yes.

20        Q.   Now, according to your complaint you

21   received a letter of rejection on December 29th,

22   1998, correct?

23        A.   Yes.

24             MR. MCQUADE:  Let's mark that as the

25             next exhibit.

135

```
1
2                    (Defendant's Exhibit 14:  Marked for
3             identification.)
4
5    BY MR. MCQUADE:
6        Q.   I'm showing you what's been marked as
7    Exhibit 14.  Can you identify it?
8        A.   It's a letter from Personnel.
9        Q.   And it's signed by looks to be Susan
10   Comstock; is that correct?
11       A.   Yes.
12       Q.   And did you receive this, what we have
13   marked as Exhibit 14?
14       A.   Yes.
15       Q.   Did you know Susan Comstock before you
16   received this?
17       A.   No.  I knew the name but --
18       Q.   You hadn't met her before?
19       A.   No.
20       Q.   Exhibit 14 says, in relevant part,
21   "Unfortunately, we cannot consider your application
22   for the following reasons:  Academic:  Application
23   did not reflect the minimum educational
24   requirements as stated on the job announcement.
25   Experience:  Application did not reflect the minimum
```

156

```
 1        A.   Somewhere around there, yes.

 2        Q.   Had you returned from maternity leave at

 3   that point?

 4        A.   Yes.

 5        Q.   And you were laid off because you were

 6   bumped and you had the least seniority in the senior

 7   clerk-typist position, correct?

 8        A.   Yes.

 9        Q.   And is it correct to say that you're not

10   claiming that you were discriminated against when you

11   were laid off?

12        A.   I would have to disagree.

13        Q.   Why would you disagree?

14        A.   Because there were vacant positions at the

15   time.  As a matter of fact, the one I interviewed for

16   in Personnel.  Before I left on maternity leave,

17   Mr. Hood had said to me that they were going to try

18   to fill the position of lead inspector to allow me to

19   do the inspections and do the work when I came back

20   from maternity leave.

21        Q.   But that didn't happen?

22        A.   But that didn't happen.

23        Q.   Looking at Exhibit 1, I do not see any

24   mention of the layoff in there.  Can you point to

25   anything in the complaint that says that you are
```

ANDREWS REPORTING SERVICE
(203) 271-2190

1  suing the city for discrimination based on your

2  layoff?

3       A.   I don't know if it's attached but I did

4  file a complaint with the Department of Labor.

5  Maybe my attorney can answer why that wasn't included

6  or --

7       Q.   And if you take a look at Exhibit 4, you

8  see your CHRO complaint.   There's nothing in there

9  that mentions layoff, correct?

10      A.   That's correct.

11      Q.   So it's not mentioned --

12      A.   Can you excuse me for a minute?

13      Q.   Certainly.

14

15            (Attorney-client conference.)

16

17  BY MR. MCQUADE:

18      Q.   So there's no mention in the complaint or

19  the CHRO complaint about the layoff?

20      A.   No, there's not.

21      Q.   You then applied later on down the line for

22  a lead inspector position, correct?

23      A.   Again, yes.

24      Q.   And this time your application made it

25  through the screening process, correct?