

# CITY OF HARTFORD

OFFICE OF THE TOWN AND CITY CLERK

550 MAIN STREET

HARTFORD, CONNECTICUT 06103



MEMBER

DANIEL M. CAREY, CMC
TOWN & CITY CLERK

September 29, 2003

TO WHOM IT MAY CONCERN:

This is to certify that the attached is a true and accurate copy of the Charter of the City of Hartford as it existed in 1998 as the same appears of record and on file in the Office of the Town and City Clerk.

Attest:

Daniel M. Carey
Town and City Clerk

# PART I

# CHARTER OF THE CITY OF HARTFORD, CONNECTICUT*

Ch.   I.    Incorporation and Boundaries, §§ 1, 2
Ch.   II.   Powers of the City, §§ 1—8
Ch.   III.  The Council and Mayor, §§ 1—19
Ch.   IV.   Elections, §§ 1—11
Ch.   V.    City Manager, §§ 1—7
Ch.   VI.   Budget, §§ 1—16
Ch.   VII.  Borrowing, §§ 1—6
Ch.   VIII. Financial Administration, §§ 1—18
Ch.   IX.   City Treasurer, §§ 1—3
Ch.   X.    Public Safety, §§ 1—7
Ch.   XI.   Department of Public Works, §§ 1—4
Ch.   XII.  Department of Housing, §§ 1, 2
Ch.   XIII. Department of Engineering, §§ 1, 2
Ch.   XIV.  Health and Social Services, §§ 1—5
Ch.   XV.   Department of Parks and Recreation, §§ 1—4
Ch.   XVI.  Department of Personnel, §§ 1—14
Ch.   XVII. Pensions, §§ 1—5
Ch.   XVIII. Other City Officers and Boards, §§ 1—5
Ch.   XIX.  Planning and Zoning, §§ 1—13
Ch.   XX.   Miscellaneous Provisions, §§ 1—4
Appendix to Charter, §§ 1—53

---

*Editor's note—The Charter of the City of Hartford, set out in Part I of this volume, was approved by the qualified electors at the General Municipal Election held November 7, 1967. Said Charter, designated Ordinance No. 28-67, constituted a complete revision of the former Charter, Act No. 30, Special Laws 1947, as amended. Since Ordinance No. 28-67 omitted the text of those sections of Act No. 30, as amended, which were not changed, simply referring to them with the words, "No change," the editors have included in the historical citation following each section the source where the text will be found. Ordinance No. 28-67 has been included in each citation to indicate that all sections were approved by this ordinance. Where only Ordinance No. 28-67 is cited the section was newly enacted by this ordinance. Several editor's notes throughout the Charter, explanatory of the effect of former provisions, have been retained to assist the reader. Material in brackets has been added where necessary for clarity.

Additional acts which relate to the City of Hartford, other than specific Charter amendments, are set out in the Appendix to the Charter.

A Comparative Table listing in chronological order all acts, resolutions and ordinances cited in the Charter will be found following the Charter Appendix.

# CHAPTER I. INCORPORATION AND BOUNDARIES

## Sec. 1. Incorporation.

The inhabitants of the State of Connecticut, dwelling within the territorial limits of the City of Hartford as the same now are or may hereafter be, shall continue forever hereafter to be a body politic and corporate by the name of the "City of Hartford"; and by that name shall have perpetual succession, and be capable of suing and being sued, pleading and being impleaded, and of purchasing, holding, managing and conveying any estate real or personal; and may have a common seal and change and alter the same at pleasure. By virtue of this charter said city shall be absolutely vested with, possess and enjoy all lands, tenements, hereditaments, property and rights, choses in action and estates, which at the effective date of this charter were vested in said city.
(Sp. Laws 1947, Act No. 30, Ch. I, § 1; Ord. No. 28-67, 11-7-67)

## Sec. 2. Boundaries.

The territorial limits of the body politic and corporate existing under the name of the City of Hartford shall continue to consist of all the land and territory situate within the present limits of the Town of Hartford, and the limits of said town and city shall be the same. The boundaries of the City and Town of Hartford are declared to be as follows:

(a) Line between City and Town of Hartford and Town of Windsor. Beginning in the Connecticut River at the point of intersection of the east line of the Town of Windsor and the north line of the Town of Hartford which point is also the point of intersection of the west line of the Town of South Windsor and the north line of the Town of Hartford, thence westerly in a straight line, on a true bearing of north 88 degrees 13.00 minutes west, which line is the same line having a magnetic bearing of north 77 degrees 15 minutes west on December 8, 1905, to a stone (3) 17.80 feet northerly from the northwest corner of the foundation of the old farmhouse east of the railroad, now owned by A. Christiansen and formerly called the Hezekiah Marsh house, said stone being also 31.37 feet northwesterly from the northeast corner of said foundation. At the above described merestone (3) the city line deflects 5 degrees no minutes southerly and extends southerly about 236.9 feet to another merestone (4) marked "W" on its northerly side and "H" on its southerly side. Thence the city line deflects south 10 degrees 12 minutes and extends southerly about 369.6 feet to a brownstone merestone (5) with a grooved top, west of the railroad, set in 1889 on the site of a former stone. Thence the city line deflects about 33 degrees no minutes east or south and extends about 396 feet to a merestone (6) set December 8, 1905, on the site of a former stone. Thence the city line deflects east about 7 degrees 39 minutes and extends southerly about 1605.28 feet, passing through the building known as 16 Violet Street, through the building formerly known as 1168 Windsor Avenue; through the northwest corner of the building known as 12 Sunset Street, to a merestone (6A) marked "H" and "W" on opposite sides, located near the southeast corner of the brick garage building formerly known as 1134 Windsor Avenue, which merestone (6A) is about 96.74 feet south of the south line of Sunset Street measured along the city line, and 102.48 feet east of the east line of Main Street, formerly Windsor Avenue, as established by the city, measured along the city line. The last-described line intersects the north line of Violet Street at a point 290.95 feet west of the northwest corner of Violet and Midland Streets, making an angle with Violet Street of about 101 degrees 17.8 minutes, reading from west to north, intersects the north line of Sunset Street about 350.88 feet west of the northwest corner of Sunset and Midland Streets, making a similar angle with said street. Thence the city line deflects west about 50 degrees 19.7 minutes crossing Main Street, formerly known as Windsor Avenue, making an angle of about 62 degrees 25.75 minutes with said street, reading from south to west, about

701.9 feet to a point in the east line of Keney Park (7), which point is 4.34 feet north of a merestone marking an angle in said line of Keney Park. From the Connecticut River to this point (7) the line described herein is supposed to correspond with the ancient line of the Town of Hartford, as described in a perambulation of that line made in 1889, recorded in Hartford land records, volume 214, page 145, and resurveyed and markers replaced in 1905 jointly by the city engineer of Hartford and E. N. Phelps, surveyor for the Town of Windsor. From the above point (7) to a point (27) hereinafter described, the city and town line follows that established in 1897, special laws, volume XII, page 1174, as resurveyed in 1924 by Herbert G. Clark, engineer for the trustees of Keney Park, as follows: At the above-described point (7) in the east line of Keney Park 4.34 feet north of a merestone marking an angle in the line of said park, the city line deflects north about 103 degrees 48.50 minutes along the east line of Keney Park about 410.21 feet to a merestone (8), thence deflecting left about 0 degrees 30.4 minutes about 531.7 feet to another merestone (9), thence deflecting west about 15 degrees 28 minutes continuing along the line of said park about 461.70 feet to another merestone (10) at the northwest corner of a projection of the Town of Windsor. Thence deflecting about 84 degrees 42.8 minutes easterly about 796.11 feet along the line of Keney Park to another merestone (11); thence deflecting southerly about 17 degrees 57.5 minutes about 247.64 feet to a chisel mark on top of an ornamental fence post built of trap rock (12) marking the south end of the frontage of Keney Park on Windsor Avenue. Thence the city line deflects 77 degrees 09.5 minutes northerly along the west line of Windsor Avenue, 18.43 feet to a granite merestone (13), thence deflecting left 13 degrees 17.4 minutes about 169.28 feet, to a merestone (14) on said street line; thence deflecting west 17 degrees 31.4 minutes and continuing about 461.96 feet to a chisel mark on top of stone cap of another ornamental stone fence post of trap rock (15), marking the northeast corner of Keney Park. Thence the city line deflects west making an angle of 88 degrees 47.70 minutes, reading from the south, and runs along what was at one time the north line of Keney Park about 7529.52 feet to a concrete merestone (27) in the east line of the Town of Bloomfield, which stone also marks the southwest corner of the Town of Windsor, and is marked "H.C.M.S." on a bronze cap on its top. This course is marked by granite stones, each marked "H" and "W" set at the following-described intervals along the last-described line, beginning at the east or Windsor Avenue end: 660.25 feet, 590.05 feet, 729.92 feet, 659.90 feet, 600.10 feet, 720.04 feet, 660.08 feet, 729.90 feet, 589.96 feet, 659.88 feet, 660.00 feet and 269.44 feet to the merestone at the southwest corner of the Town of Windsor, described above.

(b) Line between City and Town of Hartford and Town of Bloomfield. The line between the City and Town of Hartford and the Town of Bloomfield begins at a merestone (27) at the southwest corner of the Town of Windsor and at the northwest corner of Keney Park; thence southerly in a straight continuation of the line between the Towns of Windsor and Bloomfield north of said stone (27), along the west line of Keney Park about 944.93 feet to a concrete merestone (28) set in 1928 about 18.67 feet north of the north line of Tower Avenue, measured on said city line extended. Said stone is about 0.82 feet south of the boulder marked "H," "W," "B" and "1835" described in the perambulation of the town line in 1889, recorded in Hartford land records, volume 214, page 145. The line thus far described is the western side of the area added to the City and Town of Hartford in 1897, special laws, volume XII, page 1174, being the former line between Windsor and Bloomfield; which line if extended south will pass through a granite merestone at the point of curvature of the north line of Tower Avenue. Thence the town line deflects west about 88 degrees 35 minutes and extends

about 66 feet to a point in the north line of Tower Avenue as established by vote of the court of common council of the City of Hartford on April 18, 1904. Thence the town line continues as established by an act approved May 15, 1939, (1939 S.L. 163) i.e., westerly along and coincident with the north line of Tower Avenue, being a straight extension of said north line established as above to the intersection of said line with the east line of Coventry Street, as established by The Metropolitan District Commission on July 11, 1932. Thence the town line extends northerly along and coincident with the east line of Coventry Street, established as above, to a point about 118 feet south of the south line of East Burnham Street. Thence said line continued northerly along and coincident with the east line of a street variously known as Coventry Street and Fairlawn Avenue, to a point opposite the north line of the building lots on the north side of East Morningside Street, being 100 feet north of the northeast corner of said Fairlawn Avenue and East Morningside Street. Thence the town line crosses Fairlawn Avenue and continues west along the north line of lots on the north side of East Morningside Street, 100 feet north of and parallel to the north line of said East Morningside Street as said street line was established by vote of the court of common council of the City of Hartford on June 13, 1932, to the east line of Blue Hills Avenue. Said point in the east line of Blue Hills Avenue is the westerly terminus of the portion of the Hartford-Bloomfield town line which was altered and established by the act approved May 15, 1939. Thence the town line extends westerly to a brownstone merestone (40) marking the northwest corner of the City and Town of Hartford and the northeast corner of the Town of West Hartford. This course of the city line passes through two merestones (35) and (36) 2 feet out from the street lines of Blue Hills Avenue; a stone 2 feet west of the east line of Cornell Street (37); a stone 2 feet east of the west line of Palm Street (38); and a granite monument marked "H" and "B" on its respective sides, located about 1476 feet east of the center of the Central New England Railroad tracks and about 2509.3 feet east of the brownstone merestone (40) at the northwest corner of the city. West of Blue Hills Avenue this course of the city line is 100 feet north of and parallel to the north line of Morningside Street west as that street is now laid out between Blue Hills Avenue and Canaan Street. The last-described course of the line between the City and Town of Hartford and the Town of Bloomfield follows the westerly portion of the perambulation of 1890, recorded in Hartford land records, volume 214, page 208, as that line was resurveyed and in part re-marked by the department of engineering of the City of Hartford and by E. M. Peck acting as surveyor for the Town of Bloomfield in January, 1928.

(c) Line between City and Town of Hartford and Town of West Hartford. Beginning at a brownstone merestone (40) which marks the northwest corner of the City of Hartford and the northeast corner of the Town of West Hartford, thence southerly making an interior angle with the south line of the Town of Bloomfield of about 85 degrees 41 minutes about 7170 feet, more or less, to a merestone (43) in the north line of Albany Avenue. This course of the city line is further marked as follows: About 2556.18 feet south of the point of beginning (40) it passes through a granite monument (41) about 300 feet north of the north bank of the Park or Woods River, which monument is marked "H" and "WH" on its east and west sides and which was reset in perambulating the line in 1890, see Hartford land records, volume 214, page 200. The line is also marked by a brownstone monument (42) marked "H" and "WH" located about 2262.2 feet south of the last-described stone (41) at the east side of Bloomfield Avenue. The city line crosses Bloomfield Avenue obliquely, making an angle with the line of that street south of this intersection of about 12 degrees 33.25 minutes, also passing through the veranda of the house known as

145 Bloomfield Avenue at a distance of about 1.45 feet from the brickwork at the southeast corner of that house. The present highway stone (43) at the north line of Albany Avenue is about 2.43 feet north of the site of the former town line stone (44) at that point. Thus far the line between the City and Town of Hartford and the Town of West Hartford follows the line of the Parish of the Society of West Hartford, as established in 1806 by special laws, volume 1, page 555, which parish later became the Town of West Hartford, so far as those lines can be reproduced. For further description of this line see Hartford land records, volume 214, page 200. From the north line of Albany Avenue to the north line of Farmington Avenue the west line of the City of Hartford is coincident with the west line of Prospect Avenue by 1915 special laws, page 214. From the north side of Albany Avenue south about 1176 feet from the west line of Prospect Avenue was coincident with the former town line marked by the former stone (44) near the present stone (43) at the north line of Albany Avenue and a stone (45) near the property line between numbers 1155 and 1161 Prospect Avenue. Thence to a granite merestone (46) on the northwest street corner of Prospect Avenue and Asylum Avenue the west line of Prospect Avenue follows the line of land deeded by Beach for said street, or about 10 feet west of the older line. Thence across Asylum Avenue about 60.09 feet to a granite stone (47) under the roadway at the southwest corner of Asylum and Prospect Avenues, 61.37 feet west of the east line of Prospect Avenue. Thence southerly along the west line of Prospect Avenue, 903.72 feet to a stone (48) at the south line of Elizabeth Park, about 62.12 feet west of the east line of Prospect Avenue; thence deflecting west, about 1484 feet to a granite stone (49) on the northwest street corner of Prospect Avenue and Fern Street, about 74.67 feet west of the east line of Prospect Avenue at right angles thereto; thence to Farmington Avenue 70 feet from the east line of Prospect Avenue. From the north line of Farmington Avenue southerly to the north line of Park Road as at present laid out in West Hartford, the city line is coincident with the west street line of Prospect Avenue. Thence the city line extends easterly on a straight extension of the north line of Park Road as at present laid out west of Prospect Avenue to the extension southerly of the east line of Prospect Avenue as laid out north of Park Street. Thence the city line extends southerly along a straight extension of the east line of Prospect Avenue as laid out north of Park Street to the intersection of said straight extension with a straight northerly extension of the east line of Prospect Avenue as laid out south of Park Street. Thence the city line extends southerly along said extension of the east line of Prospect Avenue, and along the east line of said Prospect Avenue as laid out in 1898 to a point 410 feet northerly from the north line of Merrill Street. Thence east at right angles to said east line 4.00 feet. Thence southerly along the east line of Prospect Avenue, as laid out by the City of Hartford on October 14, 1969, and its southerly extension to the east line of New Park Avenue. Thence the city line runs south along an extension northerly of the east line of New Park Avenue as laid out by the Town of West Hartford by vote of the West Hartford town council July 16, 1935, as described above, about 353.35 feet to the intersection of said east street line with a former town line and is marked by a granite merestone (51). The town line along this portion of New Park Avenue was altered in 1939 (1939 S.K., p. 165) to make the town and city line coincident with the east line of New Park Avenue as that avenue had then recently been widened. From Farmington Avenue to the point in the east line of Prospect Avenue, 410.00 feet north from the north line of Merrill Street, the town line as described herein follows the line established by an act approved May 15, 1939, to be found in 1939 special acts, page 165. Thence the town line deflects easterly about 30 degrees 37.50 minutes and extends southerly about 4651.57 feet to the southerly line of New

Britain Avenue. This course was more particularly marked, or defined in 1928 as follows: About 699.90 feet south of east line of New Park Avenue the city line passes through a concrete merestone (52), 2 feet north of the south line of Flatbush Avenue near the east line of the right-of-way of the Penn-Central Company, formerly known as the New York, New Haven and Hartford Railroad Company, and about 176.49 feet west of a city merestone opposite beveled street corner of Flatbush Avenue and Newfield Avenue. This stone (52) was set in 1924 to supersede a former monument near the same point. About 1691.30 feet south of the merestone (52) at Flatbush Avenue, the city line passes through a granite stone (53) marked "WH" and "H" described in the perambulation of this line made in 1890, recorded in Hartford land records, volume 214, page 200. About 2260.26 feet south of the last-named stone (53), the city line crosses New Britain Avenue and passes through a stone (54), 2.09 feet north of the south line of New Britain Avenue (measured in said city line) to the south line of New Britain Avenue. The city line makes an angle with New Britain Avenue of about 72 degrees 50.125 minutes reading from north to east. Thence westerly along the south line of New Britain Avenue 9.22 feet to the point of intersection of the south line of New Britain Avenue and the east line of Hollywood Avenue. Thence southerly along the east line of Hollywood Avenue, as established by the Town of West Hartford September 3, 1941, to the point of intersection of the east line of Hollywood Avenue and the north line of Marion Street (referred to in the 1890 perambulation as Mountain Avenue). Thence east along the north line of Marion Street 0.69 feet to the point of intersection of the north line of Marion Street and the existing city line. Thence southerly to a concrete merestone (55) set at a point 367 feet south of the south line of Marion Street, marking the southwest corner of the City and Town of Hartford and the southeast corner of the Town of West Hartford.

(d) Line between City and Town of Hartford and Town of Newington. The south line of the city begins at a concrete merestone (55) about 367 feet south of Marion Street and about 1.79 feet east of the range of the east line of Hollywood Avenue produced southerly, which stone marks the southeast corner of the Town of West Hartford. Thence the city line makes an interior angle of 86 degrees 33.50 minutes, reading from north to east, and extends easterly about 1265.87 feet to a concrete merestone set on the site of a former brownstone merestone (56) near Newington Avenue. Thence it deflects northerly about 0 degrees 26.3 minutes and extends about 997.26 feet to a granite merestone (57) marked "1891" standing on top of Cedar Mountain, so-called, at the northeast corner of the Town of Newington and the northwest corner of the Town of Wethersfield.

(e) Line between City and Town of Hartford and Town of Wethersfield. The boundary between the City and Town of Hartford and the Town of Wethersfield begins at a granite merestone (57) marked "1891" standing on top of Cedar Mountain at the northeast corner of the Town of Newington; and extends thence easterly in a straight line about 4071.29 feet to an angle point (61) in Ridge Road 32.23 feet beyond a concrete stone on this line, passing through a stone (59) marked "C.H.D." standing at the west side of the New Haven Turnpike as that highway is marked south of the city, or about 11.7 feet east of the west line of Maple Avenue as that street line has been established by the city; about 138.22 feet east of this last stone (59) the city line passes through a concrete stone (60) marked "H.C.M.S." on four top corners, set 2 feet east of the west line of Ridge Road as established by the city, 32.23 feet east of this last stone (60) is the site of a former stone (61) in Ridge Road at which point is an angle in the city line. At the point (61) last above-described, in Ridge Road, the city line deflects northerly about 4 degrees 27 minutes and extends thence easterly about 4456.93

feet to a red sandstone merestone (63) about 500 feet west of Franklin Avenue standing in the north fence line of property formerly of Goodrich and located about 138 feet from the south line of Victoria Road in the rear of premises known as 161 Victoria Road. At the stone last mentioned (63), the line deflects northerly about 0 degrees 40 minutes and continues east in general along the rear lines of lots facing the south side of Victoria Road, passing through a granite merestone (64) marked "1891" standing in the rear of premises known as 21 Victoria Road. This last-named course is parallel to and 140 feet south of the south line of Victoria Road as established between Franklin Avenue and Wethersfield Avenue. From the stone (64), the city line extends east, crossing the former bed of Folly Brook, Wethersfield Avenue and the tracks of the Connecticut Valley Railroad to a granite merestone (65) set in 1891, marked on its west face "1891" and on its east face "NF 1636," being the monument commonly known as the "NF" or Nathaniel Foote stone. This "NF" stone (65) is about 10.23 feet east of the east line of property of the Standard Structural Steel Company and within property purchased by the City of Hartford in 1930 for the South Meadows dike. At the "NF" stone (65), the city line deflects southerly about 1 degree 52 minutes and runs easterly across the South Meadows about 1635.10 feet to another merestone (66) standing on what was formerly known as "Standish Island." Thence the line continues in the same course about 1177.64 feet to a concrete merestone (67) marking the site of a former brownstone merestone. This concrete merestone (67) is at the intersection of this line, formerly known as the "Pennywise line" and the line formerly known as the "Pewter Pot Brook line." At the last-described stone (67), the city line deflects southerly about 27 degrees 32 minutes and runs about 1376 feet to another stone (68) about 300 feet west of the Connecticut River. Thence deflecting to the south about 0 degrees 15.50 minutes the line extends to and across the Connect-icut River to the southeast corner of the City of Hartford. This line between the City and Town of Hartford and the Town of Wethersfield follows the line perambulated in 1892 by representatives of the two towns concerned as recorded in Hartford land records, volume 222, page 229, to which reference may be made.

(f) Line between City and Town of Hartford and Town of East Hartford. The eastern boundary of the City and Town of Hartford is the centerline of the Connecticut River (at the ordinary stage of water therein).

(g) Line between City and Town of Hartford and Town of South Windsor. The easterly boundary of the Town and City of Hartford is the centerline of the Connecticut River (at the ordinary stage of water therein).

(Sp. Laws 1947, Act No. 30, Ch. I, § 2; Ord. No. 28-67, 11-7-67; Sp. Laws 1971, Act No. 106)

## CHAPTER II. POWERS OF THE CITY

### Sec. 1. Financial powers.

Subject to subsequent provisions of this charter the city shall have power:

(a) To make appropriations for the support of the city government to carry out its corporate powers and to pay its debts, including annual appropriations for the support of a free public library and art museum, for the Children's Museum of Hartford, and for public celebrations and receptions not to exceed three thousand dollars ($3,000.00) for any one such celebration or reception;

(b) To borrow money and issue the bonds and notes of the city therefor;

(c) To lay taxes on the ratable estate within the city and on such other objects of taxation as may be authorized by law;

(d) To appropriate, without reference to other provisions of this charter, not more than five hundred thousand dollars ($500,000.00) in any one (1) year for the purpose of meeting a public emergency threatening the

lives, health or property of citizens; provided such appropriation shall require at least seven affirmative votes in the council;

(e) To accept or refuse gifts, donations or grants from any source for any purpose, whether general or limited, related to the activities of the city government or the safety, welfare or comfort of the people;

(f) To advance money duly appropriated for the purpose, to the United States of America or any department or agency thereof in accordance with federal statutes and regulations, when necessary to secure federal cooperation in projects beneficial to the city or its inhabitants.

(Sp. Laws 1947, Act No. 30, Ch. II, § 1; Sp. Laws 1957, Act No. 641, § 1; Ord. No. 28-67, 11-7-67)

### Sec. 2. Powers in respect of public works and buildings.

Subject to the provisions of this charter the city shall have power:

(a) To lay out, construct, reconstruct, alter, maintain, repair, abandon, control and operate streets, alleys, boulevards, bridges, underpasses, sidewalks, curbs, gutters, public walks, garbage and refuse disposal facilities, cemeteries, parks, parkways, playgrounds, playfields, field houses, recreation centers, swimming pools, bathhouses, markets, comfort stations, hospitals, clinics, institutions for children, the aged, infirm and chronically ill, parking lots, other off-street parking facilities, airports and their accessories, docks, wharves, schoolhouses, libraries, marinas, auditoriums, civic centers and any and all buildings necessary or convenient for carrying on the government of the city;

(b) To drain and fill lowlands, construct dikes to prevent floods, divert the course of non-navigable streams and establish building and bulkhead lines on the Park River;

(c) To improve the navigation of the Connecticut River;

(d) To collect and dispose of ashes, garbage and refuse;

(e) To clean, light and keep free from encroachments and obstructions all streets and public grounds;

(f) To provide for opening, widening and changing the grade of streets, and the establishment and alteration of curb, sidewalk, building, veranda, porch and bay window lines; determine, subject to the rights of The Metropolitan District, the location in, under and above the streets and other public grounds of all pipes, conduits and wires; order before laying permanent pavement in any street the relaying, renewal and repair of pipes and conduits therein; establish the conditions under which pavements may be cut for the renewal, repair, relocation or removal of pipes and conduits; set out, care for and remove trees, shrubs, vines and other ornaments in the street; and provide for the removal of snow, ice and sleet from sidewalks at the expense of the owner of the abutting property;

(g) To defray the whole or any part of the cost of any public work or improvement by the assessment of benefits on the owners of real estate, including the State of Connecticut, specially benefited by such work or improvement, whether or not such real estate abuts upon such work or improvement, and to enforce and collect such assessments as a personal liability of the owner or directly as a lien on the lands benefited; provided the owner of any property damaged by such improvement shall be entitled to receive from the city the actual amount of such damage apart from any benefits on account of such work or improvement, and the amount of benefits assessed shall be set off against the amount appraised as damages or vice versa as the case may be. The city shall provide by ordinance for the extension of time for, and the manner of payment of, all such assessments and may issue and dispose of assessment certificates covering the amounts of any extended assessments. Nothing in this section shall apply to the

mere repairing or reconstructing of any existing work or improvement once completed. (Sp. Laws 1947, Act No. 30, Ch. II, § 2; Ord. No. 28-67, 11-7-67)

### Sec. 3. Powers in respect of housing.

Subject to the provisions of the charter the city shall have power:

(a) To investigate housing conditions and to determine if such be the case that there is an acute shortage of decent, safe and sanitary dwelling accommodations for families of low and moderate income and for families displaced or about to be displaced from their dwelling accommodations by redevelopment or urban renewal projects under chapter 130 of the general statutes or by the construction of highways, bridges or flood control projects by the city or by the state or the federal government or other public body, at rentals which such families can afford to pay, that such shortage will not be relieved through the operation of private enterprise and that the construction of housing projects for such families by the city, therefore, will not be competitive with private enterprise;

(b) Upon such determination, and in order to relieve such shortage, to qualify the city for any special financing or mortgage insurance programs enacted by the congress of the United States or by the general assembly of the state which would stimulate the construction, reconstruction or rehabilitation of rental or sales housing either by private enterprise alone or by joint action of private enterprise and the city; to acquire sites or existing buildings for leasing to private interests to construct, reconstruct or rehabilitate, operate and maintain moderate rental housing projects, or to acquire sites or existing buildings for and to construct, reconstruct or rehabilitate moderate rental housing projects for leasing to private interests or to acquire sites or existing buildings and to construct, reconstruct or rehabilitate, operate and maintain moderate rental housing projects, provided families displaced from their dwelling accommodations as aforesaid which are not families of low or moderate income shall be permitted to occupy dwelling units in any such project only for such temporary periods of time as the city shall determine to be reasonable, and provided, except in leaseholds with private interests, the rentals charged for dwelling units in any such project shall not be higher than necessary to produce revenues sufficient:

(1) To meet principal and interest payments on bonds issued by the city to meet the development cost of such project,

(2) To meet the costs of operating and maintaining such project, including reasonable repairs, maintenance and replacement reserve, vacancy and collection loss reserve and debt service reserve, and

(3) To return to the city in lieu of real property taxes and special assessments of any kind an annual payment to be determined by the city not in excess of ten percent of the shelter rent per annum for each dwelling unit in such project; and

(c) Upon its determination that the acute shortage of such dwelling accommodations has terminated or that it is to the best interests of the city to do so, to sell and dispose of the whole or any part of any project upon such terms as it may deem advisable, provided no part of such project shall be sold for a price less than its then fair market value as determined by the director of housing, and provided the proceeds of any such sale or sales, after payment of all necessary expenses incident thereto, shall be retained by the city in a special fund and applied so far as practical to meet principal and interest payments on or to redeem any outstanding bonds issued by the city to meet the cost of any project. For the purposes of this section, "families of low and moderate income" shall mean families which lack the amount of income which is necessary, as determined by the city, to enable them

without financial assistance to live in decent, safe and sanitary dwellings, without overcrowding; and the term "moderate rental housing project" shall mean a project consisting of dwelling units which are of good quality, adequate with respect to overall and room sizes, well but not over equipped, and so constructed that it affords low cost for maintenance and operation.

(d) To have any and all rights and powers now or hereafter conferred by the General Statutes.

(Sp. Laws 1947, Act No. 30, Ch. II, § 3; Sp. Laws 1957, Act No. 641, § 2; Sp. Laws 1959, Act No. 390; Sp. Laws 1961, Act No. 227; Ord. No. 28-67, 11-7-67)

### Sec. 4. Street improvements in Prospect Avenue.

The powers conferred on the Town of West Hartford and the City of Hartford, respectively, relating to the assessment of the costs of public improvements in Prospect Avenue on the property abutting thereon, and on the City of Hartford relating to the removal of ice and snow from sidewalks on said avenue and the assessment of the cost of removing ice and snow, by section 106 of "An Act Revising the Charter of the City of Hartford," approved June 24, 1941, shall continue to be in full force and effect.

(Sp. Laws 1947, Act No. 30, Ch. II, § 4; Sp. Laws 1957, Act No. 641, § 2; Ord. No. 28-67, 11-7-67)

Editor's note—The act referred to is Special Laws 1941, Act No. 547.

### Sec. 5. Power to adopt regulatory ordinances.

The city shall have power to adopt ordinances not in conflict with the General Statutes or the provisions of this Charter, for the preservation of the public peace, health, safety, comfort and welfare of the inhabitants of the city, and to provide penalties for the violation thereof enforceable in the city and police court but not exceeding a fine of one hundred dollars ($100.00) or imprisonment for more than thirty (30) days or both. Any individual, firm, corporation or association violating any such ordinance shall be liable to the city in a civil action for any damages caused by or arising out of such violation. The city shall have power to require wherever necessary in the execution of its powers permits or licenses and to fix the amount to be paid therefor.

(Sp. Laws 1947, Act No. 30, Ch. II, § 5; Sp. Laws 1957, Act No. 641, § 2; Ord. No. 28-67, 11-7-67)

Editor's note—City and police court functions were transferred to the circuit court, then to the common pleas court in 1974 and to the superior court in 1978.

### Sec. 6. Eminent domain.

The city, in carrying out the powers and duties conferred or imposed on it by this Charter or the General Statutes, shall have power to acquire within or without the city lands, buildings and other structures, any interest or estate in land and air rights over land, and may take the same upon paying just compensation to the owner thereof in the manner provided in Title 48 of the General Statutes as amended.

(Sp. Laws 1947, Act No. 30, Ch. II, § 6; Sp. Laws 1957, Act No. 641, § 2; Ord. No. 28-67, § 3, 11-7-67)

### Sec. 7. General grant of powers.

The city shall have not only all the powers specifically granted by this Charter but all powers fairly implied in or incident to the powers expressly granted, and all other powers incident to the management of the property, government and affairs of the city the exercise of which is not expressly forbidden by the constitution and General Statutes of the State of Connecticut. The enumeration of particular powers in this and any other chapter of this Charter shall not be construed as limiting this general grant of power but shall be considered as in addition thereto.

(Sp. Laws 1947, Act No. 30, Ch. II, § 7; Sp. Laws 1957, Act No. 641, § 2; Ord. No. 28-67, 11-7-67)

### Sec. 8. Exercise of powers.

Except as otherwise provided in this Charter all powers vested in the city shall be exercised by the court of common council, henceforth in this Charter referred to as the council.

(Sp. Laws 1947, Act No. 30, Ch. II, § 8; Sp. Laws 1957, Act No. 641, § 2; Ord. No. 28-67, 11-7-67)

## CHAPTER III. THE COUNCIL AND MAYOR

**Sec. 1. The council.**

The council shall consist of nine members elected from the city at large at the general municipal election in 1969 and every two (2) years thereafter, as provided in Chapter IV, for terms of two (2) years from the first Tuesday in December following their election. Each councilman shall receive no less than the sum of fifteen thousand dollars ($15,000.00) annually as compensation for his service, together with reimbursement for just and necessary expenses incurred in the performance of his duties. The council may review the amount of said compensation and enact revisions thereof by ordinance which shall become effective only upon approval of said ordinance by the electors of the city at a referendum held at the next regular municipal election, whereupon it shall become effective at the next term of the council. No member of the council shall hold any office of profit under the government of the United States, the State of Connecticut, or any subdivision thereof, except that of notary public, nor shall he, during the term of office for which he was elected and for one (1) year thereafter, be appointed to any other office of profit under the government of the City of Hartford. Vacancies in the council and all other elective city offices except the board of education and the mayor, from whatever cause arising shall be filled by majority vote of the council for the unexpired portion of the term, provided any vacancy shall be filled by appointment of a person of the same political party as his predecessor.
(Sp. Laws 1947, Act No. 30, Ch. III, § 1; Res. of 11-5-63; Ord. No. 28-67, 11-7-67; Ord. No. 66a-88, 8-8-88; Ref. of 11-8-88)

**Sec. 2. The mayor.**

The mayor shall be elected at the general municipal election in 1969 and every two (2) years thereafter, as provided in Chapter IV, for a term of two (2) years from the first Tuesday in December following his election and until his successor shall be duly elected and qualified. The mayor shall be an ex officio member of the council and each of its committees, without vote, and shall be policy leader of the city for the purpose of providing guidance and leadership to the council, expressing and explaining to the community the policies and programs of the city, and assisting the council in the informed, vigorous and effective exercise of its powers. Policy leadership shall be concerned with the general development of the community and the general level of city services and activity programs. The mayor, in addition to all other rights and powers herein conferred, shall have the right to appoint or nominate the membership of all boards, commissions, agencies, authorities and other bodies created by the General Statutes in accordance with the provisions thereof. The mayor shall receive no less than the sum of seventy-five thousand dollars ($75,000.00) annually as compensation for his/her service, together with reimbursement for just and necessary expenses incurred in performance of his/her duties, provided that the mayor elected at the general municipal election in 1967 shall receive the sum of ten thousand dollars ($10,000.00), annually as compensation for his service, together with said reimbursement, until election and qualification of the mayor in 1969 as aforesaid. The council may review the amount of said compensation and enact revisions thereof by ordinance which shall become effective only upon approval of said ordinance by the electors of the city at a referendum held at the next regular municipal election, whereupon it shall become effective at the next term of the mayor. No mayor shall hold any office of profit under the government of the United States of America, the State of Connecticut, or any subdivision thereof, except that of notary public, nor shall he, during the term of office for which he was elected and for one (1) year thereafter be appointed to any other office of profit under the government of the City of Hartford.
(Ord. No. 28-67, 11-7-67; Ord. No. 66b-88, 8-8-88; Ref. of 11-8-88; Ord. No. 7B-01, adopted 6-25-01, approved by electors 11-6-01)

**Sec. 3. Powers and duties of the mayor.**

The mayor shall have the following powers and duties:

(a) The mayor shall attend and preside over meetings of the council with the right to speak, but not to vote.

(b) The mayor may recommend and introduce such ordinances, resolutions, motions and

other measures to the council as he may deem necessary or expedient.

(c) The mayor shall act as the principal representative of the city in relations and affairs with the United States of America, any state government, other municipal governments, and any subdivisions, departments or agencies thereof.

(d) The mayor shall perform such other duties and exercise such other powers as may be authorized by ordinance or resolution of the council not inconsistent with this charter or as may not be inconsistent with the duties of the city manager as hereinafter set forth.

(Ord. No. 28-67, 11-7-67)

### Sec. 4. The deputy mayor.

Each newly elected council shall, at its first meeting or as soon thereafter as practicable, elect from its own number a deputy mayor. In the event the mayor is temporarily absent or temporarily disabled and is thereby unable to perform the duties of his office, the deputy mayor shall act as presiding officer of the council, shall retain his vote on any question and shall assume and exercise such other powers and duties as may be conferred upon the mayor herein except the power to veto as herein provided. In the event of death, permanent disability or resignation of the mayor, the deputy mayor shall become mayor and shall assume all powers and duties of the mayor until the next biennial election, and the council shall fill the vacancy in the council and elect a deputy mayor for the remainder of the council's term as hereinbefore provided. The mayor, or, in his absence or temporary disability, the deputy mayor, may designate another member of the council as acting mayor during such absence or disability of both the mayor and deputy mayor.

(Ord. No. 28-67, 11-7-67)

### Sec. 5. City clerk.

The council shall appoint a town and city clerk to serve for an indefinite term. The town and city clerk holding office at the effective date of this amendment shall continue to hold office until his resignation, retirement, death or removal for other cause. The town and city clerk, hereafter referred to in this charter as the city clerk, shall have all the powers and duties conferred or imposed by law on town clerks, shall act as clerk of the council and shall have such other powers and duties as are prescribed in this charter or by the council. He shall appoint and remove, subject to the provisions of Chapter XVI of this charter, all deputies, assistants or employees in his office. He shall receive a compensation to be fixed by the council and all fees collected by him shall be paid into the city treasury. It shall be sufficient attestation of the land records in the care or custody of the city clerk when each volume of such land records shall bear a certificate of attestation with the written signature of the officer charged with the care of such records and authorized by law to record or file the same, providing nothing herein contained shall relieve the city clerk or his assistant from noting the discharge of a mortgage, lien or other encumbrance on the margin of the record of such mortgage, lien or other encumbrance.

(Sp. Laws 1947, Act No. 30, Ch. III, § 3; Res. of 11-5-63; Ord. No. 28-67, 11-7-67)

### Sec. 6. Meetings.

(a) *Regular meetings.* The first meeting of a newly elected council shall be held at eight o'clock p.m. in the council chamber in the municipal building on the first Tuesday in December following the general municipal election. Such meeting shall be called to order by the city clerk, who shall administer the oath of office to the duly elected members. Thereafter the council shall meet regularly on the second and fourth Monday evenings of each month at eight o'clock p.m., except that its rules may provide for only one (1) regular meeting in each of the months of July and August. If a regular meeting falls on a legal holiday or on the day before a legal holiday, then said regular meeting shall be held on the next business day following such legal holiday.

(b) *Special meetings.* Special meetings may be held at any time the council may direct and also may be called on forty-eight (48) hours' notice by the city manager, the mayor or any three (3) members of the council. The notice of any special meeting shall be in such form and shall be delivered in such manner as the council shall prescribe

by ordinance. It shall contain a statement of the specific item or items of business to be transacted and no other business shall be transacted at such special meeting.

(c) *Emergency meetings.* In the event a public emergency arises or threatens to arise involving or threatening the lives or property of the inhabitants of the city or the property of the city, the mayor may call an emergency meeting of the council upon three (3) hours' notice and may summon councilmen to attend such meeting in such manner as the council may prescribe by ordinance. Notwithstanding any provision of law or this charter to the contrary, at such meeting, the council may transact any item or items of business relevant to such emergency.

(d) All meetings shall be open to the public.
(Sp. Laws 1947, Act No. 30, Ch. III, § 4; Sp. Laws 1957, Act No. 237; Ord. No. 28-67, 11-7-67)

### Sec. 7. Journal.

The council shall keep for public inspection a journal which shall be the official record of its proceedings and shall be published in such manner as it shall determine.
(Sp. Laws 1947, Act No. 30, Ch. III, § 5; Ord. No. 28-67, 11-7-67)

### Sec. 8. Rules of procedure.

The council shall have power, subject to the provisions of this charter, to adopt its own rules of procedure.
(Sp. Laws 1947, Act No. 30, Ch. III, § 6; Ord. No. 28-67, 11-7-67)

### Sec. 9. Voting.

No ordinance, resolution, motion or vote shall be passed by the council, except motions of a purely procedural nature, unless it shall have received the affirmative votes of at least five (5) members. All voting, except on procedural motions, shall be by roll call and the ayes and nays shall be recorded in the journal.
(Sp. Laws 1947, Act No. 30, Ch. III, § 7; Ord. No. 28-67, 11-7-67)

### Sec. 10. Ordinances, when required.

In addition to such acts of the council as are required by the general statutes or by other provisions of this charter to be by ordinance, every act creating, altering or abolishing any agency, office or employment, or assigning or reassigning the same to departments, fixing compensation, making an appropriation, authorizing the borrowing of money, levying a tax, establishing any rule or regulation for the violation of which a penalty is imposed, or placing any burden upon or limiting the use of private property, shall be by ordinance.
(Sp. Laws 1947, Act No. 30, Ch. III, § 8; Ord. No. 28-67, 11-7-67)

### Sec. 11. Form of ordinances.

Every ordinance, except the annual budget ordinance and an ordinance making a general codification of ordinances, shall be confined to a single subject which shall be clearly expressed in its title. All ordinances shall be introduced in written or printed form. All ordinances which amend or repeal existing ordinances shall set forth in full the section or subsection to be amended or repealed and if it is to be amended shall indicate matter to be omitted from the revised section or subsection by enclosing the same in brackets and new matter by underscoring. When published prior to enactment in a newspaper or otherwise the same indications of omitted and new matter shall be used except that italics may be substituted for underscoring. The enacting clause of all ordinances shall be: "Be it ordained by the court of common council of the City of Hartford." Unless another date is specified therein an ordinance shall take effect on the tenth day following its passage.
(Sp. Laws 1947, Act No. 30, Ch. III, § 9; Ord. No. 28-67, 11-7-67)

### Sec. 12. Procedure for passage of ordinances.

(a) *Introduction, first reading and publication.* An ordinance may be introduced at any regular meeting by the mayor, by any member of the council, any committee thereof, or the city manager. Upon introduction it shall be read a first time and a day and hour set, not earlier than the

seventh day thereafter, at which the council or a committee thereof shall hold a public hearing thereon. Such hearing may be at a regular meeting of the council or at such time and place as the council may order and may be adjourned from time to time. It shall be the duty of the city clerk to publish the title and/or statement of purpose of every ordinance introduced, within three (3) days after its introduction, as a paid advertisement once in a daily newspaper of general circulation in the city, together with a notice of the time and place at which the public hearing thereon shall be held and notice that a full copy of the ordinance is on file in the office of the city clerk for public inspection. Immediately upon his publication, the city clerk shall place a copy of the publication clipped from such newspaper, together with a copy of the ordinance, in a file for use of the council. Copies of the ordinance shall be maintained in the office of the city clerk in suitable form for inspection and distribution.

(b) *Public hearing, second reading and passage.* No ordinance, except an emergency ordinance as defined in subsection (c) of this section, shall be read the second time and passed prior to the second regular meeting following its introduction nor until the conclusion of public hearings thereon. Following the first reading of any ordinance it shall be the duty of the corporation counsel to examine it for form and legality and no ordinance shall be read a second time unless his written opinion thereon shall be on file in the office of the city clerk. The council shall have the option to accept or reject an amendment at that meeting, or, to reassign the entire matter for public hearing as an original ordinance. If the amendment is approved and if the amendment is substantial, the proposed ordinance, as amended, shall be republished and assigned for public hearing, as provided in the case of a newly introduced ordinance, and shall not be finally passed prior to the next regular meeting following such amendment. If the amendment is defeated, the ordinance may be finally passed at that meeting.

(c) *Emergency ordinances.* Emergency ordinances for the immediate preservation of the public peace, health and safety may be introduced at any regular meeting, special meeting or emergency meeting, provided, in the case of a special meeting, the subject thereof has been included in the notice for such meeting. An emergency ordinance shall be read a first time and published as provided in the case of other ordinances and may be read a second time and passed with or without amendment at any regular, special or emergency meeting subsequent to such publication. An emergency ordinance shall contain a specific statement of the emergency. Seven (7) affirmative votes shall be necessary for the adoption of an emergency ordinance.

(d) *Approval of ordinances and appropriations by the mayor.*

(i) Every ordinance, except an emergency ordinance, a budgetary appropriation ordinance, and a tax levy ordinance, shall, before it becomes effective, be certified by the city clerk to the mayor for his approval. The mayor shall sign the proposed ordinance, if he approves it, whereupon it shall become effective in accordance with its terms. If he disapproves a proposed ordinance, he shall within seven (7) days return it to the city clerk with a statement of the reasons for his disapproval which statement shall be transmitted by said clerk to the council at its next regular meeting. If the council shall pass the proposed ordinance by an affirmative vote of at least six (6) members within fourteen (14) days or at the next meeting of the council held after such ordinance has been returned with the mayor's disapproval, whichever is later, it shall become effective without his approval. If the mayor does not return the proposed ordinance within the time required, it shall become effective without his approval.

(ii) The mayor may disapprove or reduce any item or items of expenditure in any proposed appropriation. If the mayor disapproves or reduces any item or items of expenditure, he shall, within two (2) days after submission to him pursuant to section 8(b) of Chapter VI hereof, return it to the city clerk together with a statement of the reasons for his action. The city clerk shall transmit said statement to the council forthwith. In the event the mayor shall disapprove or reduce any item or items of expen-

diture, the approved portion thereof shall become effective unless the disapproved or reduced portion thereof is passed over the mayor's veto by an affirmative vote of six (6) councilmen within the time allowed for adoption of the budget or passage of an appropriation hereunder, whereupon the item or items of expenditure shall become effective as finally passed. Failure of the mayor to act upon any proposed item or items of expenditure within two (2) days as above set forth shall constitute approval of the proposed item or items of expenditure.

(e) *Waiver of reading.* By the unanimous consent of the council members present, any first or second reading, or both, of an ordinance may be waived and said ordinance read by title and statement of purpose.
(Sp. Laws 1947, Act No. 30, Ch. III, § 10; Sp. Laws 1957, Act No. 233; Res. of 11-5-63; Ord. No. 28-67, 11-7-67)

### Sec. 13. Record and publication of ordinances.

Every ordinance after passage shall be given a serial number, printed in the journal, and recorded by the city clerk in a book to be kept for that purpose which shall be properly indexed. All ordinances for the violation of which a penalty is imposed or which impose any burden on or limit the use of private property and all ordinances authorizing the issuance of bonds shall be published by the city clerk once in a daily newspaper of general circulation in the city, within three (3) days of their passage, in the same manner and form as provided in section 12(a) of Chapter III of this charter. As soon as practicable after the first Tuesday in June, 1969, there shall be prepared under the direction of the corporation counsel by a competent legal publishing house employed by the city a codification of all ordinances in force, eliminating all obsolete and conflicting provisions. Said codification shall be passed by the council as a single ordinance and without prior publication. Upon its passage it shall be published in loose-leaf form. A similar recodification shall be prepared, passed and published as above provided, every ten (10) years thereafter. Copies of all ordinances shall be printed as promptly as possible after their passage in the same loose-leaf form as the codification, for distribution.
(Sp. Laws 1947, Act No. 30, Ch. III, § 11; Ord. No. 28-67, 11-7-67; Ord. No. 27-69, § 1, 5-21-69; Sp. Laws 1969, Act No. 139, § 1)

   Editor's note—Ord. No. 27-69 has been codified as amending § 13 rather than § 11 as specified therein at the discretion of the city.

### Sec. 14. Powers over the organization and operation of the city government.

The council shall have the power to provide by ordinance not inconsistent with the provisions of this charter for the organization, conduct and operation of the departments, agencies and offices established by this charter; for the creation of additional divisions, bureaus, offices and agencies, for their alteration or abolition, for their assignment and reassignment to departments; and for the number, titles, qualifications, powers, duties and compensation of all officers and employees of the city, subject in the case of the titles and qualifications of members of the classified service to the provisions of Chapter XVI of this charter; for the forms of oaths and the amount and conditions of surety bonds to be required of certain officers; and for the making of rules and regulations necessary for the control, management and operation of all public buildings, grounds, parks, cemeteries or other property of the city. The council may, by ordinance, transfer functions and activities between departments and consolidate and reorganize departments, except that no such transfer, consolidation or reorganization may be made affecting the offices of the treasurer, corporation counsel, city clerk, mayor or registrar of voters.
(Sp. Laws 1947, Act No. 30, Ch. III, § 12; Ord. No. 28-67, 11-7-67)

### Sec. 15. Appointments and removals.

(a) *Nomination of commission and board members.* The mayor shall nominate all members of the commission on the city plan, zoning board of appeals, personnel board, regional affairs commission and all other boards, commissions and other bodies of the city now or hereafter established, and shall submit his nominations to the council for approval.

(b) *Approval of nominations.* The council shall, within its next two (2) regular meetings after submission of a nomination by the mayor, affirm or reject said nomination in accordance with the voting procedure set forth in section 9 of this chapter, in failure of which said nomination shall be deemed confirmed.

(c) *Appointment of officers and employees.* In making appointments of officers and employees, the council shall vote in accordance with the voting procedure set forth in section 9 of this chapter.

(d) *Removal of officers and employees.* The council may remove any officer or employee appointed by it upon affirmative vote of at least six (6) members, provided the officer or employee shall have been served with a written notice of the intention of the council to remove him, containing a clear statement of the grounds for such removal and of the time and place, not less than ten (10) days after the service of such notice, at which he shall be given an opportunity to be heard thereon. After such hearing, which shall be public at the option of the officer or employee and at which he may be represented by counsel, the action of the council shall be final. From the service of notice until final action by the council the officer or employee shall be ineligible to perform the duties of his office or employment but he shall continue to receive his salary or wages pending such final action.
(Sp. Laws 1947, Act No. 30, Ch. III, § 13; Ord. No. 28-67, 11-7-67)

### Sec. 16. Removal of elective officers.

The council, by a vote of at least six (6) members, may remove any elective officer, including a member of the council or a member of the board of education, after notice and hearing as provided by the preceding section in the case of appointive officers. Witnesses whose testimony shall be pertinent to the charge shall be subpoenaed by the council at the request of the defending officer. From a decision of the council to remove an elective officer an appeal shall lie to the superior court of Hartford County.
(Sp. Laws 1947, Act No. 30, Ch. III, § 14; Ord. No. 28-67, 11-7-67)

### Sec. 17. Power of investigation.

The council, or any committee thereof when so authorized by the council, shall have power to investigate the official conduct of any department or agency of the city government or of any officer or employee thereof. For the purpose of conducting any such investigation and hearings relating to the removal of appointive or elective officers any member of the council shall have power to administer oaths and the council or authorized committees thereof may compel the attendance of witnesses and require the production of books and papers. Any person who refuses to obey the subpoena of the council or an authorized committee thereof shall be fined not more than one hundred dollars ($100.00) or imprisoned not more than thirty (30) days or both.
(Sp. Laws 1947, Act No. 30, Ch. III, § 15; Ord. No. 28-67, 11-7-67)

### Sec. 18. Annual audit.

The council shall designate annually an independent public accountant or firm of independent public accountants to audit the books and accounts of the city as provided in the general statutes.
(Sp. Laws 1947, Act No. 30, Ch. III, § 16; Ord. No. 28-67, 11-7-67)

### Sec. 19. Public emergencies.

Whenever a public emergency exists or threatens to arise involving or threatening the lives or property of inhabitants of the city or property of the city, the mayor may declare such emergency and direct the city manager to mobilize, organize and direct the forces of the city and to call upon and cooperate with the forces of the state and other political subdivisions. The city manager may summon, marshal, deputize or otherwise employ other persons or do whatever he may deem necessary for the purpose of meeting the emergency. The city manager may obligate the city in an amount of money not to exceed one hundred thousand dollars ($100,000.00) to cope with such emergency until the council convenes. The termination of the emergency shall be determined and declared by the mayor.
(Ord. No. 28-67, 11-7-67)

## CHAPTER IV. ELECTIONS

### Sec. 1. Applicability of general statutes.

Except as specifically provided herein, the general statutes, revision of 1958, as amended, relating to elections, including, without limitation, nomination of candidates, shall be applicable to all elections held in accordance with the provisions of this charter. The council shall provide by ordinance for the manner of warning municipal elections and such additional regulations in respect of elections, not inconsistent with the statutes or this charter, as may be necessary to accomplish the intent of this chapter.
(Sp. Laws 1947, Act No. 30, Ch. IV, § 1; Ord. No. 28-67, 11-7-67)
   Cross reference—Date of unlocking voting machines, Appendix, § 1.

### Sec. 2. General municipal election.

(a) *Election of the mayor, councilmen and city treasurer.* A general municipal election shall be held on the Tuesday following the first Monday in November, 1969, and every two (2) years thereafter. At each such general municipal election, there shall be elected a mayor, nine (9) members of the council and a city treasurer, each for terms of two (2) years commencing on the first Tuesday in December following their election. No elector shall, at any general municipal election, vote for more than six (6) candidates for the council.

(b) *Election of the board of education.* At the general municipal election held in 1969 and every four (4) years thereafter, there shall be elected five (5) members of the board of education. At the general municipal election held in 1971 and every four (4) years thereafter, there shall be elected four (4) members of the board of education. The terms of members of the board of education shall be four (4) years and shall commence on the first Tuesday in December following their election. The terms of the members of the board of education serving on the effective date hereof shall not be affected hereby.
(Sp. Laws 1947, Act No. 30, Ch. IV, § 2; Res. of 11-5-63; Ord. No. 28-67, 11-7-67)

### Sec. 3. Nomination of candidates.

(a) *Primary election.* Candidates for the board of education shall be nominated at a primary election to be held on the third Tuesday preceding the general municipal election. The candidates for each office at such primary election, to a number equal to twice the number to be elected to that office, receiving the greatest number of votes, shall be deemed to be duly nominated, provided, if the number of candidates for any office in whose behalf valid petitions have been filed, as hereinafter provided, shall not exceed twice the number to be elected to that office, no primary election shall be held in respect of that office but the candidates in whose behalf valid petitions have been filed shall be deemed to be duly nominated and their names shall be placed on the voting machines at the ensuing general municipal election. The names of candidates at the primary election shall be arranged on the voting machines in alphabetical order, after the title of the office to be filled and without any party designation of any kind. No elector shall vote for more than two (2) candidates for the board of education, except that at the primary election to be held in 1947 each elector may vote for two (2) candidates for the board of education for the six-year term and two (2) for the four-year term. Otherwise such primary election shall be conducted in the same manner and the powers and duties of the city clerk, registrars of voters and all other officers of the city with respect thereto shall be the same as in the case of a regular general municipal election.

(b) *Petition presenting candidates for nomination.* The name of any elector of the city shall be placed on the voting machines at the primary election as a candidate for any office to be filled at the ensuing general municipal election, in whose behalf there shall be filed with the city clerk not less than forty (40) nor more than sixty (60) days prior to such primary election a petition presenting him as a candidate for nomination signed by not fewer than two hundred fifty (250) electors whose names appear in the latest official list of the registrars of voters and whose names appear on no more petitions presenting for nomination candidates for the same office than the elector is entitled to vote for in the ensuing primary election, provided an acceptance of candidacy is filed with such petition.

18