UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ELENA POMA F/K/A ELENA AQUINO  :    CIVIL ACTION NO. 3:02CV543 (MRK)
        Plaintiff,

v.

CITY OF HARTFORD/
HEALTH DEPARTMENT             :    DECEMBER 31, 2003
        Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff in the above captioned matter respectfully submits this Memorandum of Law in Support of her Objection to the Defendant's Motion for Summary Judgment. Summary Judgment should be denied because the Plaintiff has established sufficient evidence to create a genuine issue of material fact as to the issues of whether she was denied promotion to the position of Lead Inspector on the basis of her race, ancestry, sex and pregnancy and in retaliation for filing an internal complaint. The Defendants claim that the Plaintiff cannot make out a viable Title VII claim based on her race, ancestry, sex or pregnancy; that her 1997 claim for failure to promote is barred by the applicable statute of limitations; that her Connecticut Fair Employment Practices Act claims are barred for failure to obtain a release of such claims; and that Plaintiff cannot offer sufficient evidence to demonstrate a hostile work environment claim. Plaintiff believes that she has a viable Title VII claim; that her 1997 claims are part of the continuing ongoing discrimination faced by Plaintiff; that Plaintiff exhausted her remedies for her CFEPA claims, and that she can offer sufficient evidence to demonstrate a hostile work environment claim.

## I. FACTS:

Plaintiff was an employee of the City of Hartford's Department of Health from December 30, 1996 until March of 1999. Affidavit of Poma ¶1. Plaintiff held the position of Senior Clerk Typist. Affidavit of Poma ¶1.

While working in said Department, beginning on or about February 1997 Plaintiff was routinely requested to go out with the "Health Sanitation Inspector" (otherwise known as "Lead Inspector") to perform Lead Inspections. Affidavit of Poma ¶2-3.

In December of 1997, the position of Lead Inspector became available. Affidavit of Poma ¶6. At the time, Plaintiff was on maternity leave. Affidavit of Poma ¶4. Plaintiff had been informed that the position may be available and Plaintiff asked Owen Humphries and Kevin Hood, her supervisors regarding the Lead Inspector application process. Affidavit of Poma ¶5. They assured her she would be afforded the opportunity to apply for the position. Affidavit of Poma ¶5. The position was posted on December 4, 1997 and applications were accepted only through December 19, 1997. See Deposition of Poma Exhibit 7. Plaintiff was never informed that the position was posted. Affidavit of Poma ¶6. Due to the fact that she was not informed of the posting, the Plaintiff did not apply for the position. See Affidavit of Poma ¶6. It was unusual for the posting to be open for such a relatively short period of time. See Deposition of Poma p. 83.

The Defendant subsequently hired Bennie Crudup, an African American male, for the Lead Inspector position. Affidavit of Poma ¶7. Despite the fact that the Defendant hired Mr. Crudup for the Lead Inspector position, the Plaintiff was still obliged to assist Mr. Crudup and the other Lead Inspector, Kenneth Ellison, with performing inspections and epidemiological investigations. Affidavit of Poma ¶8.

On March 18, 1998, the Plaintiff informed Kevin Hood that she felt she was working out of her job class and further, that she wished to be compensated for the same. Affidavit of Poma ¶9. Instead of considering Plaintiff's request, Mr. Hood then informed the Plaintiff that in the event she filed a grievance regarding this matter, she could be barred from performing future inspections as a result, such action thereby jeopardizing her opportunities for advancement. Affidavit of Poma ¶10. Mr. Hood then suggested that the Plaintiff speak to Director Katherine McCormack in order to express her interest in the Lead Inspector position. Affidavit of Poma ¶11. However, Mr. Hood informed the Plaintiff that Ms. McCormack did not harbor a favorable impression of her. Affidavit of Poma ¶11. In that the Plaintiff's contact with Ms. McCormack was very limited (indeed, Ms. McCormack neither supervised the Plaintiff nor worked in her particular unit), Affidavit of Poma ¶12, it appears that if Ms. McCormack did not view the Plaintiff with favor, such could only be based upon the fact that she was pregnant and/or Hispanic.

On or about May 19, 1998, the Plaintiff became a State Certified Lead Inspector and continued performing inspections until September of 1998. Affidavit of Poma ¶13.

Unfortunately, the harassment in Ms. Poma's workplace began to increase. On September 11, 1998, Mr. Hood informed the Plaintiff that Ms. McCormack had mentioned to him that the Plaintiff spent too much time talking about "personal things" to her co-worker, Ms. Matilde Bello. Affidavit of Poma ¶14. Upon information and belief, Ms. McCormack automatically assumed that the Plaintiff's conversations with Ms. Bello were personal simply because she and Ms. Bello were speaking in Spanish. Affidavit of Poma ¶14. Upon information and belief, however, Ms. McCormack does not speak Spanish and is in no way qualified to

characterize the substance of the Plaintiff's conversations with Ms. Bello. Affidavit of Poma ¶14.

On October 14, 1998, while the Plaintiff was having a conversation with Ms. Bello, Kevin Hood approached the Plaintiff and proceeded to state "This is what Katherine was talking about." Affidavit of Poma ¶15. Mr. Hood's statement gives rise to an inference that there was an issue or problem regarding the Plaintiff's native language, Spanish, and by extension, her ancestry, Hispanic. Affidavit of Poma ¶15. On or about October 14, 1998, the Plaintiff filed a complaint against Kevin Hood, her immediate supervisor, with Defendant's Human Resources Department based upon the fact that Mr. Hood was harassing the Plaintiff during work hours simply because she was speaking Spanish to her co-worker. Affidavit of Poma ¶16.

On October 27, 1998, Ms. Poma's Supervisor Owen Humphries sent the Plaintiff a memo regarding RMD - XRF training that she should attend; this training was mandatory for all Lead Inspectors. Affidavit of Poma ¶17. See Affidavit of Poma Exhibit C. On November 2, 1998, the Plaintiff submitted a request to her supervisor, Kevin Hood, that she be permitted to attend the RMD-XRF training; on November 5, 1998, the Plaintiff's request was denied. Defendant's alleged reason for said denial was that the training did not fall within her job description. Affidavit of Poma ¶18.

Defendant's reason for this denial is false in that Defendant and Ms. Pomas's Supervisor, Kevin Hood, were well aware of the fact that the Plaintiff had performed Lead Inspector duties for the Defendant. Affidavit of Poma ¶19. They were also aware that the Plaintiff was highly interested in the Lead Inspector position (and therefore would be well served by attending the training).Affidavit of Poma ¶19. Finally, Defendant was well aware of the fact that the denial of

this particular training request would hinder the Plaintiff in her efforts to advance (i.e. to be promoted to the Lead Inspector position). Affidavit of Poma ¶19.

On November 20, 1998, the Plaintiff, who was pregnant with her second child, met with Ponn Mahayosnand, the Defendant's Deputy Director, and requested that she examine the issue of the Plaintiff's training request. Affidavit of Poma ¶20. Rather than address this specific concern however, Ms. Mahayosnand instead asked the Plaintiff when her baby was due and how long she was planning to be out on maternity leave. Affidavit of Poma ¶20; Deposition of Poma at 118-21. These queries from Ms. Mahayosnand give rise to an inference that the Plaintiff's pregnancy was related to Defendant's refusal to deny the Plaintiff the RMD-XRF training.

On December 3, 1998, Ms. Mahayosnand told the Plaintiff that she could not authorize the RMD-XRF training because the Lead Inspector position was now open, and that granting the Plaintiff the opportunity to attend the training would not be fair to the other applicants because such would grant the Plaintiff an unfair advantage. Affidavit of Poma ¶21. This was the same excuse that Ms. McCormack had presented to Godfred Ansah, Human Resource Representative for Defendant, who investigated the Plaintiff's October 14th complaint against Kevin Hood. Affidavit of Poma ¶21. However, the Plaintiff being trained in the RMD-XRF calibration process would make her specially qualified for the job and, if anything would be advantageous to the Defendant as well as the Plaintiff if the Defendant wanted the Plaintiff to obtain the position.

Meanwhile, Bennie Crudup was promoted in or about July of 1998 to the position of Public Health Sanitarian, thereby creating a vacancy in the Lead Inspector position. Affidavit of Poma ¶22. On November 25, 1998, the Lead inspector position was posted. Affidavit of Poma ¶23. Plaintiff applied for it in a timely manner. Affidavit of Poma ¶23. Plaintiff was again pregnant with her second child. See Affidavit of Poma ¶ 1. The job requirements were as

follows: Graduation for High School, two years of college, and two years of "responsible experience in the field of public health sanitation, involving public contact." See Affidavit of Poma ¶23 and Exhibit E. The posting also stated "Whenever appropriate equivalents will be considered." *Id.* Neither the posting nor the application requested a transcript to be submitted. *Id.* Plaintiff noted on her application that she attended North Tech. Institute from April 1990 to December 1990; PBCC from January 1990 to December of 1991; and MCTC from 1992 to "present," i.e. 1998. Affidavit of Poma ¶26 and Exhibit F. Nowhere on the application did application request the number of credits that Plaintiff had completed. Id.

Plaintiff noted the following on her application in the section inquiring of "other training."

> Attended Lead Inspector and Risk Assessor Training and received certificates in May, 1998. Attended a one day Lead Abatement Course at CRT on November 16, 1998. I have perform (sic) inspections, epidemiological investigations and perform (sic) other duties currently assigned to a Lead Inspector.

Affidavit of Poma ¶27 and Exhibit H thereto.

On the application, the Plaintiff identified her duties as Senior Clerk Typist as follows:

> Performed epidemiological and lead investigation under the supervision of the current lead inspectors. Provided educational material to families to help them prevent further lead poisoning to their children. Prepare orders to owners for abatement of lead. Serve as liason between medical providers, state agencies, community agencies. Type monthly report and other letters, forms, affidavits for completion of abatement. Attend Court.

Affidavit of Poma ¶28 and Exhibit H.

On or about December 29, 1998, Plaintiff received correspondence from the Personnel office of the Health Department, indicating that Plaintiff did not meet the minimum requirements for the position. Affidavit of Poma ¶23-4 and Exhibit F thereto.

The Plaintiff's application reflected that she had two years experience in the Health Department as well as over five years public contact on all prior jobs. See Affidavit of Poma ¶29 and Exhibit H thereto.

The Defendant now requires employees to submit transcripts with their applications, but did not require it at that time. This requirement is clearly stated on the application. Affidavit of Poma ¶30.

The Plaintiff was qualified for the job of Lead Inspector, as evidenced by the letter from Katherine McCormack. See Affidavit of Poma ¶31 and Exhibit I attached thereto. The Plaintiff's qualifications were the same then as they had been when she was previously denied the position in December of 1998, although this time the Plaintiff was allegedly denied because she inquired as to a flexible schedule. See Affidavit of Poma ¶31.

The Defendant knew that certain positions were going to be eliminated in 1999, and by leaving the Plaintiff in the Senior Clerk Typist position, rather than promoting her, they knew she would be laid off in March of 1999. See Affidavit of Poma ¶32.

The Plaintiff was represented by Attorney Robert Muchinsky at the CHRO level. (See Affidavit of Christine E. Corriveau ¶2. On September 19, 2001, Attorney Francis Miniter signed an appearance letter which requested a Release of Jurisdiction in the above capted matter. The letter was sent to the CHRO at their address at 1229 Albany Avenue, Hartford, Connecticut. (See Affidavit of Christine E. Corriveau Exhibit A).

On November 8, 2001, the CHRO rejected Ms. Poma's Request for Reconsideration and sent the decision to Ms. Poma. The decision was cc'd to Attorney Muchinsky. No copy of the decision was forwarded to her then current attorneys, Miniter and Associates despite their appearance in the matter. (See Affidavit of Corriveau Exhibit B)

On or about January 4, 2002, Attorney Christine Corriveau called the CHRO to inquire where the Right to Sue letter was. She was informed that the CHRO had already made its decision and the case was closed. The CHRO refused to act on Ms. Poma's counsel's request for a Release of Jurisdiction. (See Affidavit of Christine Corriveau ¶5.)

Further correspondence between Attorney Miniter and the CHRO ensued. On or about February 4, 2002, the Managing Director & Commission Attorney Raymond P. Pech wrote to Attorney Miniter and noted that the "file was located in our Special Enforcement Unit, located at the Commission's Central Office on 21 Grand Street in Hartford while the reconsideration request was pending. As the September 19, 2001 letter is addressed to our Capitol Region office at 1229 Albany Avenue, it is possible that the letter was misplaced in transit..." (See Affidavit of Christine E. Corriveau, Exhibit C). The letter further went on to refuse to grant a Release of Jurisdiction. (See Affidavit of Christine E. Corriveau ¶6)

## II. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides for the granting of a summary judgment motion if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of summary judgment is to determine whether a trial will be necessary. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "[t]he [Plaintiff's] burden of establishing a prima facie case... is not onerous" Fisher v. Vassar College, 114 F.3d. 1332 (2d. Cir. 1997) citing Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). In

fact, Plaintiff's burden of establishing a prima facie case of discrimination has frequently been described as "minimal." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

B. **Plaintiff's claims Concerning the 1997 Lead Inspector Promotional Opportunity lend Support to Plaintiff's 1998 Claims.**

The Plaintiff believes that there was a pattern and practice involved in denying her the opportunity to obtain a promotion to lead inspector. First, in December of 1997, when the position of Lead Inspector became available. (Affidavit of Poma ¶6.) Plaintiff believed she was eligible for the job and made it known to her supervisors, Own Humphries and Kevin Hood that she was interested in the position, and they falsely assured her that she would be notified when the position was posted. Affidavit of Poma ¶5. At the time the position became posted, however, Plaintiff was on maternity leave. Affidavit of Poma ¶4. The position was posted for only a very brief time - from December 4, 1997 through December 19, 1997, (See Deposition of Poma and Exhibit 7 thereto.) And neither of her supervisors never informed the Plaintiff that the position had been posted. Affidavit of Poma ¶6. In addition, it was unusual for the posting to be open for such a relatively short period of time. See Deposition of Poma p. 83. The timing of the posting - during her maternity leave- and the lack of notification to Plaintiff even with her earlier inquiries, show that the Defendant intended to exclude the Plaintiff from the application process.

These conscious acts and omissions form part of the pattern that continued with the further maneuvers engaged in by the Defendants in 1998, in particular, the attempts at intimidation; the ignorant and biased verbal attacks because Plaintiff spoke Spanish; the wrongful exclusion of Plaintiff from taking a course necessary to her job position; the wrongful exclusion of Plaintiff for competing for the position of Lead Inspector; the deliberate positioning of Plaintiff for termination by layoff.

C. **Plaintiff Exhausted her State Administrative Remedies**

The Defendant claims that the Plaintiff's CFEPA claims should fail because the Plaintiff did not receive a Release of Jurisdiction from the CHRO. Plaintiff believes she has exhausted her remedies at the CHRO level. Plaintiff's counsel filed a timely appearance and requested a Release of Jurisdiction on or about September 19, 2001. The CHRO made its decision on the Request for Reconsideration on or about November 8, 2001 and failed to inform Plaintiff's counsel of such decision. (See Affidavit of Christine E. Corriveau). By the time Plaintiff's counsel was even aware of the November 8, 2001 decision, any request for a Release of Jurisdiction was untimely.

The CHRO does not claim it never received the appearance. It claims that the appearance was not in its file and that it may have been "lost in transit." (See affidavit of Christine E. Corriveau Exhibit C.) The Plaintiff has done everything to exhaust her administrative remedies (i.e. filed an appearance, requested a Release of Jurisdiction.) Through the CHRO's error, the Plaintiff's request for a Release of Jurisdiction was unreasonably denied. Therefore, the Plaintiff's CFEPA claims should not be dismissed, as she has attempted to comply with the requirements but was thwarted through the CHRO's mistake.

D. **Plaintiff makes out a Prima Facie case for discrimination based on her race, ancestry, sex, pregnancy and in retaliation for filing an internal complaint regarding discrimination.**

**1. Plaintiff has established discrimination in the Promotional Process.**

a. **Plaintiff's Prima facie case.**

The Plaintiff has established a prima facie case in regards to the denial of a promotion to Lead Inspector in November of 1998. A plaintiff has the burden of establishing a prima facie

case of discrimination by showing that he or she: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was denied the position; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination. <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 150 (2d Cir. 2000); <u>Rosen v. Thornburgh</u>, 928 F.2d 528, 532 (2d Cir. 1991).

The Defendant concedes that the Plaintiff is a member of a protected class (pregnant female) and that an adverse employment decision was taken when she was denied the position of Lead Inspector. However, Plaintiff was also in a protected class as a Hispanic female, and this would be known to all individual Defendants who learned her name.

In applying the test, we find the plaintiff was a pregnant Hispanic female, who is unquestionably in two protected classes.

The second part of the test is whether the Plaintiff was qualified for the position. The Plaintiff was very qualified for the November, 1998 position. Job requirements were two years of college and two years of "responsible experience in the field of public health sanitation, involving public contact." It was also clearly stated that "whenever appropriate equivalents will be considered." The Plaintiff had worked for the Health Department since December 30, 1996, which was almost two full years. By the time the rejection letter was issued on December 29, 1998, she was one day short of two years with the Health Department.

Plaintiff noted on her application that she attended the following colleges from 1990 through 1998: North Tech. Institute from April 1990 to December 1990; PBCC from January 1990 to December of 1991; and MCTC from 1992 to "present," i.e. 1998. Affidavit of Poma ¶26 and Exhibit H. Nowhere on the application did the application request the number of credits that Plaintiff had completed. *Id.* It seems clear that Plaintiff had at least two years of college

noted on the job application, and in fact she did.

Plaintiff also noted that she had worked with the public for over 4 years. Her application indicated that she worked with the Department of Human Services from 1994 until she was transferred to the Department of Health in December of 1996 where she remained until the relevant time in question. (See Affidavit of Poma Exhibit H).

The Plaintiff also noted that she had education and training for the job. The Plaintiff indicated her training as follows:

> Attended Lead Inspector and Risk Assessor Training and received certificates in May, 1998. Attended a one day Lead Abatement Course at CRT on November 16, 1998. I have perform (sic) inspections, epidemiological investigations and perform (sic) other duties currently assigned to a Lead Inspector.

Affidavit of Poma ¶27 and Exhibit H.

On the application, the Plaintiff identified her duties as Senior Clerk Typist as follows:

> Performed epidemiological and lead investigation under the supervision of the current lead inspectors. Provided educational material to families to help them prevent further lead poisoning to their children. Prepare orders to owners for abatement of lead. Serve as liason between medical providers, state agencies, community agencies. Type monthly report and other letters, forms, affidavits for completion of abatement. Attend Court.

These qualifications are more than adequate to qualify Plaintiff for the job, especially when the Defendant clearly stated that whenever possible, equivalents will be considered. In fact, the only training that the Plaintiff did not have was the RMD-XRF training that was denied to the Plaintiff by Kevin Hood. The training was denied the Plaintiff because she filed a grievance against Hood because he was harassing her due to speaking Spanish while in the workplace.

The third part of the test is that the Plaintiff was denied the position. It is clear that the Plaintiff was denied the position of Lead Inspector in November of 1998.

The fourth part of the test is that the circumstances of the adverse employment decision give rise to an inference of discrimination. There are four reasons Plaintiff believes she was discriminated against: 1) that, being well qualified for the job, she was informed that the denial was due to her lack of qualifications, a blatant and indefensible lie; 2) that it was apparent from her application that she was Hispanic; 3) that she was retaliated against by filing a grievance against Kevin Hood when he denied her the RMD-XRF training that would have qualified her for the job and 4) because when she went to inquire about it to human resources, rather than following up on her inquiries, she was met with questions about her pregnancy by Ponn Mahayosnand, Defendant's Deputy Director of Human Resources.  The grievance of Kevin Hood was filed on October 14, 1998 and Ms. Mahayosnand's comments on Ms. Poma's pregnancy took place on or about November 20, 1998.  Ms. Poma was denied the job on December 29, 1998.  The timing of the events give rise to an inference of discriminatory intent.

**b.     Defendant's Reasons for its decisions are false.**

After the plaintiff has established a prima facie case of discrimination, we now turn to the remaining stages of the McDonnell Douglas analysis. Under McDonnell Douglas, once plaintiff establishes a prima facie case, a presumption arises that his employer unlawfully discriminated against him. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). To rebut this presumption, the employer must come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward plaintiff. See id. The Defendant has argued that it did not promote the Plaintiff because she was not qualified for the position.

The reasons for Defendant's decisions just do not ring true.  First of all, the Defendant claims the Plaintiff did not have enough education for the job, but Plaintiff indicated that she had

been attending college from 1990 until "present," i.e. 1998. The job posting never required that a college transcript be affixed to the application. Plaintiff's application noted several years of college, special educational training, lead inspector certification and on-the-job training.

Second, in reviewing Defendant's brief, it seems ludicrous that it stated that she did not have two years' job experience because she started working for them on December 30, 1996 and her application was dated December 3, 1998 (Affidavit of Poma Exhibit H) and the letter denying her the position was dated December 29, 1998 (Affidavit of Poma Exhibit F). The posting clearly stated that whenever possible, equivalents will be considered, so to stand behind a technicality that she was one day short of two years experience seems a false justification and a pretext for discrimination.

Third, it was disturbing that Defendant's brief that it repeatedly characterized Plaintiff's lead inspection experience as "tagging along" with the lead inspectors. Defendant's attempt to minimize and trivialize Plaintiff's duties is a credibility judgment that seems most appropriately to be made by a jury. The common terminology for what she did in that period is "apprenticeship", the gaining of experience from a master of the field.

**c.    Plaintiff has met the initial burden of proof sufficient to withstand Summary Judgment.**

Plaintiff has met the burden to withstand the Summary Judgment phase of her claim. She has shown that her claim passes the four tests in making a prima facie case. She has also shown that the Defendant's reasons for denying her the position of Lead Inspector are false.

**2. Plaintiff has established an Actionable Hostile Environment claim.**

"In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted). Incidents that are "few in number" and that occur "over a short period of time" may fail to demonstrate a hostile work environment. Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987). At the same time, "[i]t is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989).

The Plaintiff has shown that she was met with two types of pervasive intimidation and discrimination. In the first instance, she was repeatedly reprimanded for speaking Spanish in the workplace by her Supervisor, Kevin Hood. There is nothing on the record that indicates that the Plaintiff's discussions were anything but work related. The Plaintiff filed a grievance and was then denied training that would have helped to qualify her for the position of Lead Inspector.

In the second instance, the Plaintiff went to Human Resources to inquire as to the training, she was met with comments regarding her pregnancy by the Deputy Director of Human Resources. This followed by less than a year Plaintiff's past experience of being denied the opportunity to apply for the 1997 Lead Inspector position due to her maternity leave. The environment was undoubtedly hostile in regards to her pregnancy.

We submit that to a woman who was not just a mother and pregnant but Spanish speaking and Hispanic, the environment was doubly hostile and pervaded with false assumptions, such as that two Hispanic people speaking Spanish cannot be doing their job or that

an Hispanic woman with children cannot be a reliable or serious employee. These are the thoughts behind the statements made to Plaintiff.

## III.   CONCLUSION.

For the foregoing reasons, the Court should deny the Defendant's Motion for Summary Judgment.

PLAINTIFF

BY: *Christine E. Corriveau*
Christine E. Corriveau
Miniter & Associates
100 Wells Street Unit 1D
Hartford, CT 06106
(860) 560-2590
Federal Bar # No.: ct21212

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed to the following counsel of record this 31st day of December, 2003:

Joseph W. McQuade
Kainan Escalera & McHale, PC
21 Oak Street Suite 601
Hartford, CT 06106

Christine E. Corriveau